Exhibit F

**Jonathan Sacks**

---

**From:** Jonathan Sacks
**Sent:** Thursday, September 24, 2026 2:14 PM
**To:** John Brylski
**Cc:** Ronald Stadler
**Subject:** RE: Reply to your last on Good Faith Meet-and-Confer Regarding Discovery
**Attachments:** brylski-cert.pdf; 2024 Price GL POLICY.pdf

Mr. Brylski,

The applicable insurance policy is attached.

**JONATHAN SACKS**
Shareholder
Stadler Sacks LLC

Telephone: 262-304-0610
Direct Dial: 262-304-0610, Ext. 2
Email: jes@stadlersacks.com
Website: www.stadlersacks.com

303 – B North Main Street
West Bend WI 53095

---

**From:** John Brylski <jasnowshoe@aol.com>
**Sent:** Thursday, September 17, 2026 10:20 AM
**To:** Jonathan Sacks <jes@stadlersacks.com>
**Subject:** Reply to your last on Good Faith Meet-and-Confer Regarding Discovery

Dear Attorney Sacks, Thank you for your prompt response and for agreeing to provide the applicable Wisconsin County Mutual Insurance Corporation policy. I appreciate your willingness to request and produce these materials. I will mark my files to reflect that the Defendant has agreed to produce the complete policy and declaration pages upon receipt, resolving this specific discovery issue without the need for judicial intervention. Please update me as soon as the documents are received from the carrier. Sincerely,

John J. Brylski Plaintiff, Pro Se

WISCONSIN County MUTUAL

September 24, 2026

Stadler Sacks LLC
Attorney Jonathan Sacks
303-B North Main Street
West Bend, WI 53095

Re: John Byrlski v Price County
Claim No: 300.79044
DOL: 7-25-24

I formally submit that the enclosed is a true, accurate, and certified copy of the liability insurance policy issued to Price County for the year January 1, 2024 to January 1, 2025.

Signed and dated this 24th day of September, 2026.

Brian Knee
WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION

SHEILA BISEK NOTARY PUBLIC STATE OF WISCONSIN

Subscribed and sworn to before me this
24th day of September, 2026.

Notary Public, State of Wisconsin
My Commission expires: 6-13-30

WISCONSIN county MUTUAL

# WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION

**Home office at:**
**22 E. Mifflin Street – Suite 900**
**Madison, Wisconsin 53703**

## PUBLIC ENTITY LIABILITY INSURANCE

**Declarations - Public Entity General and Automobile Liability,**
**Uninsured and Underinsured Motorists Insurance and Medical Payments Coverage**

| | | | |
|---|---|---|---|
| Policy Number: | 15124 | Renewal of Number: | 15123 |
| Named Insured: | Price County | Mailing Address: | 126 Cherry Street<br>Phillips, WI 54555 |

Policy Period: From 1/1/2024 To 1/1/2025 12:01 A.M. Standard time at the Mailing Address above.

**LIMITS OF INSURANCE**

Public Entity Liability Limit of Insurance: $10,000,000 inclusive of the amount of the deductible

Bodily Injury and Property Damage (Coverage A) Limit of Insurance:

$10,000,000 per occurrence inclusive of the amount of the deductible

Personal Injury (Coverage B) and Errors and Omissions (Coverage C) Limit of Insurance:

$10,000,000 per offense inclusive of the amount of the deductible

Criminal Defense Reimbursement (Coverage D) Limit of Insurance: $100,000 per occurrence

**Note: The Limit of Insurance for Bodily Injury and Property Damage (Coverage A) and the Limit of Insurance for Personal Injury (Coverage B) and Errors and Omissions (Coverage C) and Criminal Defense Reimbursement (Coverage D) are part of and not in addition to the Public Entity Liability Limit of insurance.**

Limit for Uninsured Motorist Liability: $25,000 per person / $50,000 per accident, inclusive of the amount of the deductible

Limit of Underinsured Motorist Liability: $ n/a per person/$ n/a per accident, inclusive of the amount of the deductible
Limit for Medical Payments Coverage: $ n/a per person per accident, as per Endorsement WCMIC03103, if applicable

**RETROACTIVE DATE (COVERAGES A & B, excluding claims arising out of the use, loading or unloading of an automobile):** NONE
(Enter Date or "None" if no Retroactive Date applies)

**RETROACTIVE DATE (COVERAGE C):** 5/1/1989
(Enter Date or "None" if no Retroactive Date applies)

**DEDUCTIBLE: Liability Deductible as per Endorsement DED09 (10-09)**

**PREMIUM** Net Premium: $177,726.00

The Premium for this policy is determined by the rate for this entity for this period applied to the actual ratable operating expenditures taken from the 12/31/2022 Audited Financial Statement.

Willie Johnson, Jr.
Chairman

Thomas Wegner
Secretary

1/23/2024
Date

Karen Flynn
Authorized Agent

WISCONSIN county MUTUAL

**WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION**
**Home office at:**
**22 E. Mifflin Street – Suite 900**
**Madison, Wisconsin 53703**

**PUBLIC ENTITY LIABILITY INSURANCE**

**Supplemental Declarations - Public Entity General and Automobile Liability, Uninsured and Underinsured Motorists Insurance and Medical Payments Coverage**

| **FORMS AND ENDORSEMENTS** (other than applicable Forms and Endorsements shown elsewhere in this policy) |
|---|
| Forms and Endorsements applying to this Policy and made part of this policy at time of issue:<br>WCMIC-D300113 (09/2022) Public Entity Liability Insurance Declarations<br>WCMIC-D3002(10/09) Public Entity Liability Insurance Supplemental Declarations<br>WCMIC-300224 (11/2022) Public Entity Liability Insurance Policy<br>WCMIC-END C70223 (11/2023) Cyber Enhancement Endorsement<br>WCMIC-END-03003(10/09) Deductible Liability Insurance Endorsement<br>WCMIC-END M3010 (10/09) General Endorsement Premium Installment<br>WCMIC-END-3024(10/10) Legal Loss Prevention Services<br>Policyholder Disclosure Notice of Terrorism Insurance Coverage<br>WCMIC-END M31011 (10/12) Uninsured Motorist Endorsement<br>GEN-1 (1/91) Personal Injury - Airport<br>WCMIC - END 7721 (4/05) Snowmobile License Agreement<br>WCMIC - END 7715 (4/05) Services Performed<br>WCMIC - END 7713 (4/05) License Agreement<br>WCMIC - END-ID-705A (12/2020) Identity Recovery Coverage |

Willie Johnson, Jr.
Chairman

Thomas Wegner
Secretary

1/31/2024
Date

Karen Flynn
Authorized Agent

**PUBLIC ENTITY LIABILITY INSURANCE POLICY**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words *you* and *your* refer to the Named Insured shown in the Declarations. The words *we*, *us* and *our* refer to Wisconsin County Mutual Insurance Corporation.

The word *insured* means any person or organization qualifying as such under Section III - Who is an Insured.

Other words and phrases that appear in italics have special meaning. Refer to Section VI - Definitions.

**SECTION I - INSURING AGREEMENT**

*We* will pay on behalf of the *insured* those sums that the *insured* becomes legally obligated to pay as damages because of:

Coverage A - *Bodily Injury* and *Property Damage* caused by an *occurrence*

Coverage B - *Personal Injury*

Coverage C - *Errors and Omissions*

*We* will reimburse an *insured* for those sums the *insured* incurs that fall within the scope of:

Coverage D – *Criminal Defense Reimbursement*

**Retroactive Date**

If the Policy Declarations include a Retroactive Date for General Liability prior to the inception of the policy period, *bodily injury, property damage,* and *personal injury* shall include *bodily injury, property damage,* and *personal injury* that occurs after the Retroactive Date but prior to the inception of the policy period, provided that no *insured* knew, prior to the inception of the policy period, that such *bodily injury, property damage* or *personal injury* had occurred in whole or in part. If the Policy Declarations include a Retroactive Date for Errors and Omissions prior to the inception of the policy period, and *personal injury* coverage was provided to the Named Insured by a separate Public Officials Errors and Omissions policy prior to the inception of this policy, *errors and omissions* shall include *personal injury* that occurs after the Retroactive Date but prior to the inception of the policy period, provided that no *insured* knew, prior to the inception of the policy period, that such *personal injury* had occurred in whole or in part.

## SECTION II - DEFENSE AND SETTLEMENT

*We* have the right and duty to defend any *suit* against the *insured* seeking monetarydamages and/or plaintiffs attorneys fees on account of *bodily injury*, *personal injury*, *property damage* or *errors and omissions* or any combination thereof to which thisinsurance applies, but:

1. The amount *we* will pay for damages is limited as described in Section IV - Limits of Insurance;

2. *We* may, at *our* discretion, investigate any *occurrence* or *offense* and settle any *claim* or *suit* that may result even if the settlement amount is exclusively within the *insured's* deductible, and

3. Our right and duty to defend end when *we* have used up the Limit of Insurance in the payment of judgments or settlements under Coverages A, B or C. This applies to both *claims* and *suits* pending at the time the Limit of Insurance is used up and those filed thereafter.

*Defense costs* are payable in addition to the policy limit and only after any applicable deductible has been exhausted by payment of *damages* or *defense costs*.

Coverage for *Criminal Defense Reimbursement* does not require a *suit* against the *insured* seeking monetary damages and/or plaintiffs attorney fees on account of *bodily injury, personal injury, property damage or errors and omissions.*

## SECTION III - WHO IS AN *INSURED*

*Insured* means:

1. *You*, and

2. *Your* past or present employees or elected or appointed officials while acting within the scope of their employment or authority, and authorized volunteers while acting for *you* or on *your* behalf, including all commissions, agencies, boards, districts, authorities or similar entities when *you* retain the right to control the details of the work of these individuals or entities, except this insurance shall be excess of any insurance maintained by *your* past or present employees, elected or appointed officials, or authorized volunteers for the ownership, maintenance, or use of any *automobiles* owned by the employee, official, or volunteer, regardless of whether such *automobiles* are also hired or borrowed by *you.*

3. Anyone else is an *insured* while using with *your* permission, an *automobile you* own, hire or borrow, except this insurance shall apply excess of any insurance maintained by:

   a. An *insured* working in a business of selling, servicing, repairing or parking *automobiles* and then only up to the limits required by Wisconsin financial responsibility law.

   b. An owner of an *automobile you* hire or borrow.

**SECTION IV - LIMIT OF INSURANCE**

A. *Our* total limit of liability for damages under Coverages A, B and C resulting from any one *occurrence* and any one *offense* will not exceed the Public Entity Liability Limit of Insurance specified in the declarations, inclusive of the amount of the deductible. This will be true regardless of:

   1. The number of *insureds*,

   2. The number of policy coverages involved in the loss,

   3. The number of *claims* made or *suits* brought for any *occurrence or any offense*, and

   4. The number of persons or organizations making *claims* or bringing *suits*.

B. In determining *our* limit of liability for Coverage A, all damages because of *bodily injury* and *property damage* arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one *occurrence*. In determining our limit of liability for Coverages B and C, all damages arising out of *offenses* that are logically or causally connected by reason of any common fact, circumstance, situation, transaction, event or decision shall be considered as arising out of one *offense.*

C. There is no limit to the number of *occurrences* or *offenses* for which a *claim* may be made or a *suit* may be brought.

D. If a *claim* or *suit* is covered under more than one Coverage, *we* will designate only one of the potentially applicable Coverages to apply to the *claim* or *suit.* The most *we* will pay is the Limit of Insurance applicable to the Coverage *we* designate, subject always to the total Public Entity Liability Limit of Insurance.

**SECTION V - EXCLUSIONS**

This policy does not apply to:

A. As respects coverage afforded under Section I, Coverage A – *Bodily Injury and Property Damage,* to *bodily injury* or *property damage* expected or intended from the standpoint of the *insured*. This exclusion does not apply to *bodily injury* or *property damage* resulting from the use of reasonable force to protect persons or property, including the use of force by a law enforcement agency of *yours*, if done within the scope of agency procedures.

B. As respects coverage afforded under Section I, Coverage A - *Bodily Injury* and *Property Damage*, liability arising out of the ownership, maintenance, use, loading or unloading or operation of:

1. Any aircraft, or

2. Airfields and runways, or

3. Hangars, buildings or other properties in connection with aviation activities.

This exclusion does not apply to *your* liability for *bodily injury and property damage* arising from the ownership, maintenance, use, loading or unloading, or operation of a nonowned aircraft which *you* hire, lease, borrow, or commission for aerial photography operations, aerial investigation/evaluation of weather damage, search and rescue operations, marijuana eradication and search operations, or emergency management operations (as defined in Wis. Stats. Chap. 166), including *your* liability arising from a statutory duty to indemnify *your* emergency management employees or volunteers for tort liability incurred in their good faith and reasonable performance of emergency management activities. However, except as to *your* liability arising from a statutory duty to indemnify *your* emergency management employees or volunteers for tort liability incurred in their good faith and reasonable performance of emergency management activities, this insurance shall apply in excess of any collectible insurance maintained by the owner or operator of the non-owned aircraft.

C. As respects coverage afforded under Section I, Coverage A - *Bodily Injury* and *Property Damage* and as respects coverage afforded under Section I, Coverage B - *Personal Injury*, liability arising out of any hospital, nursing home, mental health facility or other operation which provides *medical professional services*, but this exclusion does not apply to activities of: (1) a public health nurse while acting within the scope of his or her employment by *you,* (2) exclusively outpatient facilities for treatment of drug or alcohol dependency disabilities and their employees who are not physicians or physician's assistants, or (3) *emergency*

*medical personnel*.

D. Any obligation of the *insured* under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

E. Any liability for:

1. Any amount actually or allegedly due under the terms of any payment or performance contract or agreement;

2. That part of any award or settlement which is, or reasonably could be deemed to be, compensation for loss of salary or fringe benefits;

   This exclusion does not apply to liability under the *errors and omissions* coverage which is, or reasonably could be deemed to be, compensation for loss of fringe benefits, but only to the extent of loss of fringe benefit over and above amounts the insure would otherwise have had to pay had it not committed the misstatement or misleading statement or act or omission or neglect or breach of duty giving rise to *errors and omissions* coverage.

3. Payments owed under a collective bargaining agreement.

F. Bodily injury to:

1. An employee of the *insured* arising out of and in the course of employment by the *insured*; or,

2. The spouse, child, parent, brother or sister of that employee as a consequence of (1) above.

   This exclusion applies whether the *insured* may be liable as an employer or in any other capacity, except with respect to liability of others assumed by the *insured* under contract.

G. Liability of any kind, including but not limited to, *bodily injury, property damage, personal injury*, and *errors and omissions* liability arising out of the actual, alleged or threatened discharge, dispersal, release or escape of *pollutants*:

1. At or from premises *you* own, rent or occupy.

2. At or from any site or location used by or for *you* or others for the handling, storage, disposal, processing or treatment of waste.

3. Which are at any time transported, handled, stored, treated, disposed of,

or processed as waste by or for *you* or any person.

4. At or from any site or location on which *you* or any contractor(s) or subcontractor(s) working directly or indirectly on *your* behalf are performing operations:

   a. If the *pollutants* are brought on to the site or location in connection with such operations, or

   b. If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize *pollutants*.

   This exclusion does not apply to loss or injury caused by heat, smoke or fumes from a *hostile* fire or to loss or injury caused by the following operations:

   i. Paint overspray while applying paint;

   ii. Spilling or splashing wet concrete or asphalt while pouring or laying same;

   iii. Spilling of splashing or overspraying liquid paving tar during application of same;

   iv. Airborne drifting of sandblasting materials during sandblasting operations;

   v. Fires set by firefighters for training purposes;

   vi. Application of herbicides, pesticides or chemicals for their intended use or purpose; and

   vii. Sudden and accidental release of fuel, as a result of collision or upset of a motor vehicle, mobile equipment or other equipment. Fuel, for the purpose of this endorsement, is considered to be a substance, contained in a tank and used as a primary fuel source, for the operation of equipment to which it is attached.

H. Any loss, cost or expense arising out of any governmental direction or request that *you* test for, monitor, clean up, remove, contain, treat, detoxify or neutralize *pollutants*.

I. Liability arising out of ownership, maintenance or use, including loading or unloading. of watercraft over 26 feet in length.

J. Property damage to:

1. Property *you* own, or

2. Property *you* rent or lease where *you* have assumed liability for damage to or destruction of such property unless *you* would have been liable in the absence of such assumption of liability, or

3. Aircraft in *your* care, custody or control.

K. Liability arising out of or in any way connected with any operation of the principles of eminent domain, condemnation proceedings or *inverse condemnation*, by whatever name called, and whether or not liability accrues directly against any *insured* by virtue of any agreement entered into by or on behalf of any *insured*.

L. Personal Injury or property damage arising out of:

1. Oral or written publication of material, if authorized or ratified if the *insured* knew or should have known of its falsity.

2. Oral or written publication of material whose first publication took place before the beginning of the policy period. This subsection of this exclusion does not apply if the Policy Declarations include a Retroactive Date for *errors and omissions* prior to the inception of the policy period and *personal injury* coverage was provided by a separate Public Officials Errors and Omissions Policy for the Named Insured prior to the effective date of this policy, and a claim for *personal injury* is made during this policy period arising out of oral or written publication of material whose first publication took place after the Retroactive Date and before the beginning of the policy period, provided, however, that no *insured* knew, prior to the policy period, that such *personal injury* had occurred in whole or in part. All other subsections of this exclusion remain in full force and effect.

3. Arising out of the intentional or knowing violation of a penal statute or ordinance committed by or with the consent of the *insured*.

However, any fact pertaining to any one *insured* shall not be imputed to any other *insured* for the purpose of determining the application of this exclusion.

M. Liability arising out of the failure to supply electrical power, fuel or water or to liability arising out of the interruption of the electrical power, fuel or water supply. However, this exclusion does not apply if the failure to supply or the interruption results from the direct negligence of the insured.

N. *Errors and omissions* liability resulting in or arising from:

1. *Bodily injury* or *personal injury,* except as provided in Section I – Insuring Agreement, Retroactive Dates, if the Policy Declarations include a Retroactive Date for Errors and Omissions.

2. Physical injury to tangible property, including all resulting loss of use of that property.

3. The willful violation of a penal code or ordinance committed by or with the consent of any *insured*.

4. Any deliberately wrongful act, omission or breach of duty committed by or with the consent of any *insured.*

5. Liability of any *insured* arising in whole, or in part, out of any *insured* obtaining remunerations, financial gain, or other benefit, financial or otherwise, to which the *insured* was not legally entitled.

6. Estimates of probable costs or cost estimates being exceeded or related in any way to the preparation of bid specifications or plans.

7. Failure to perform, or breach of, a contractual obligation.

However, any fact pertaining to any one *insured* shall not be imputed to any other *insured* for the purpose of determining the application of parts (3) (4) and (5) of this exclusion.

O. Liability due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

P. Liability:

1. With respect to which an *insured* under the policy is also an *insured* under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters Nuclear Insurance Association of Canada or any of their successors, or would be an *insured* under any such policy but for its termination upon exhaustion of its limit of liability; or

2. Resulting from the hazardous properties of nuclear material and with respect to which:

   a. Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law

amendatory thereof, or

b. The *insured* is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

3. Resulting from the hazardous properties of nuclear material, if:

a. The nuclear material:

(1) Is at any nuclear facility owned by, or operated by or on behalf of, an *insured* or

(2) Has been discharged or dispersed therefrom.

b. The nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an *insured*, or

c. The *bodily injury* or *property damage* arises out of the furnishing by an *insured* of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located with the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to *property damage* to such nuclear facility and any property thereat.

As used in this exclusion:

a. Hazardous properties include radioactive, toxic or explosive properties;

b. Nuclear material means source material, special nuclear material or by-product material;

c. Source material, special nuclear material, and by-product material have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

d. Spent fuel means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

e. Waste means any waste material:

(1) Containing by-product material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for this source material content, and

(2) Resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility.

f. Nuclear facility means:

(1) Any nuclear reactor;

(2) Any equipment or device designed or used for:

(a) Separating the isotopes of uranium or plutonium,

(b) Processing or utilizing spent fuel, or

(c) Handling, processing or packaging waste;

(3) Any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the *insured* at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams plutonium or uranium 235;

(4) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and

(5) Includes the site on which any of the foregoing is located, all operations conducted on such site and all premises sued for such operations;

g. Nuclear reactor means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

h. *Property damage* includes all forms of radioactive contamination of property.

Q**.** Any liability of any kind, including but not limited to, *bodily injury, property damage, personal injury* and *errors and* omissions liability arising out of:

a. Any access, attempted access, data compromise, or disclosure of any person's or organizations' confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information (hereinafter "Electronic Data"); or
b. The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate Electronic Data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses, regulatory fines, extortion loss, business loss, or any other loss, cost or expense incurred by you or others arising out of that which is described in paragraph (a.) or (b) above.

## SECTION VI - DEFINITIONS

A. *Automobile* means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment, but does not include *mobile equipment*.

B. *Bodily injury* means *bodily injury*, sickness, disability or disease, sustained by a person during the policy period, including death resulting from any of these at any time.

C. *Claim* means a pre-suit demand for damages because of *bodily injury, property damage, personal injury*, or *errors and omissions* to which this insurance applies, including without limitation any notice or claim under Wis. Stats. Sec. 893.80.

D. *Criminal Defense Reimbursement* means as follows:

We will indemnify an insured for the insured's reasonable attorney's fees and reasonable expenses other than loss of earnings, not to exceed a maximum expenditure of $100,000 per occurrence, which fees and expenses are incurred in the defense of any criminal action or proceeding filed against the insured arising out of the insured's employment and meeting the following conditions:

1. The criminal action or proceeding is resolved through a dismissal of all criminal charges against the insured and the insured does not plead guilty to any criminal charge; or

2. The criminal action or proceeding is resolved through an acquittal of all criminal charges against the insured.

No coverage is afforded if the insured pleads guilty and/or is convicted of any

crime, either a felony or misdemeanor. No coverage is afforded if criminal charges are never filed against the insured. No coverage is afforded if the insured pleads guilty or no-contest to any non-criminal charge in exchange for dismissal of any criminal charge.

Our obligation to indemnify an insured under this coverage will not arise until the criminal action or proceeding is dismissed or after the criminal action or proceeding results in an acquittal of all criminal charges against the insured.

No coverage is afforded for fees and expenses after a mistrial, but coverage is afforded for an insured's fees and expenses up to a mistrial if the cause of the mistrial is due to an act or omission of someone other than the insured or the insured's attorney.

Under no circumstances will we pay for two trials for one insured that arise out of the same occurrence.

E. *Defense costs* means all fees and expense caused by and relating to the adjustment, investigation, defense or litigation of a *claim* or *suit* including attorney's fees, expert witness fees, court costs, and prejudgment and post judgment interest the *insured* is legally obligated to pay on that portion of any judgment we pay. *Defense costs* shall not include the office expenses of the Company or the *insured* nor the salaries of employees or officials of the Company or any *insured*.

F. *Emergency medical personnel* means (1) Emergency Medical Technicians who are not physicians (EMT's), (2) Ambulance personnel who are not authorized to prescribe medications, (3) County authorized first responders.

G. *Errors and omissions* means any misstatement or misleading statement or act or omission or neglect or breach of duty during the policy period, including misfeasance, malfeasance and nonfeasance by an *insured* in their capacity as such.

H. *Hostile fire* means a fire which becomes uncontrollable or breaks out from where it was intended to be.

I. *Inverse condemnation* means a claim by any one other than an *insured* that an *insured* has taken or diminished the value of land through land use restrictions on such land or use of adjacent land or air space by an *insured*.

J. Medical professional services means:

1. Medical, surgical, psychiatric, dental, X-ray or nursing services or treatment, or the furnishing of food or beverages in connection with such services;

2. Cosmetic or tonsorial services or treatment; or

3. The furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

K. *Mobile Equipment* means any of the following types of land vehicles:

1. Specialized equipment such as: bulldozers, power shovels, rollers, graders or scrapers; farm machinery; cranes; street sweepers or other cleaners; diggers; forklifts; pumps; generators; air compressors; drills; other similar equipment.

2. Vehicles designed for use principally off public roads.

3. Vehicles maintained solely to provide mobility for such specialized equipment when permanently attached.

4. Vehicles not required to be licensed.

5. *Automobiles* maintained for use solely on your premises or that part of other accesses that adjoin your premises.

L. *Occurrence* means an event, including continuous and repeated exposure to the same general harmful conditions, the *insured* neither expected nor intended. Expectations or intentions of any one *insured* shall not be imputed to any other *insured*.

M. *Offense* refers collectively to any offense enumerated in Paragraph L of this Section which gives rise to *personal injury* and any *errors and omissions* as defined in Paragraph G of this Section.

N. *Personal injury* means injury, other than *bodily injury*, during the policy period arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment, defective service of process;

2. Malicious prosecution;

3. Wrongful entry or eviction, or other invasion of the right of private occupancy;

4. Libel, slander or defamation of character;

5. Sexual harassment, including workplace harassment;

6. Assault and battery, including *sexual molestation;*

7. Discrimination, including employment discrimination;

8. Other civil rights violations, including employment-related violations.

O. *Pollutants* means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

P. Property damage means:

1. Physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. Loss of use, during the policy period, of tangible property that is not physically injured or destroyed. All such loss of use shall be deemed to occur at the time of the *occurrence* that caused it.

Q. *Sexual molestation* means the actual or attempted or alleged sexual contact of a person or more than one persons acting in concert.

R. *Suit* means a civil proceeding in which damages because of *bodily injury*, *property damage*, *personal injury* or *errors and omissions* to which this insurance applies are alleged. *Suit* includes an arbitration proceeding or other alternative dispute resolution proceeding alleging such damages to which *you* must submit or submit with *our* consent.

**SECTION VII - CONDITIONS**

**A. <u>*Your* duties in the Event of an *Occurrence, Offense, Claim* or *Suit*</u>**

1. If *you, your* insurance manager, or other person *you* designate to handle insurance matters think that an *occurrence* or an *offense* is likely to result in a *claim*, *you, your* insurance manager, or that person designated to handle insurance matters must see to it that *we*, or *our* authorized agents, are promptly notified as soon as reasonably possible after *you, your* insurance manager, or that person designated to handle insurance matters, has actual knowledge of the *occurrence* or the *offense*. Notice should include:

a. How, when and where the *occurrence* or *offense* took place; and

b. The names and addresses of any injured persons and witnesses.

Providing notice of an *occurrence* that has taken place or an *offense* that has been committed does not relieve *you* of *your* duty to comply with the provisions of paragraphs 2 and 3 below in the event *you* receive a *claim* or *suit*.

2. If a *claim* is received by any *insured you* must:

   a. Immediately record the specifics of the *claim* and the date received, and

   b. Notify *us* as soon as reasonably possible and provide written notice to *us* as soon as reasonably possible.

3. *You* and any involved *insureds* must:

   a. Immediately send *us* copies of any demands, notices, summaries or legal papers received in connection with the *claim* or *suit*;

   b. Authorize *us* to obtain records and other information;

   c. Cooperate with *us* in the investigation, settlement or defense of the *claim* or *suit*, and

   d. Assist *us*, upon *our* request, in the enforcement of any right against any person or organization which may be liable to the *insured* because of injury, damage or loss to which this insurance may apply.

4. Notice given by or on behalf of *you* to any authorized agent of *ours,* with particulars sufficient to identify this policy, is notice to *us.*

**B. <u>Governmental Immunity</u>**

Nothing contained in this policy shall be deemed a waiver of any statutory immunity or limitation of liability available to any *insured. We* do not waive our right to deny liability by reason of such immunity or limitation.

**C. <u>Bankruptcy</u>**

Bankruptcy or insolvency of the *insured* will not relieve *us* of *our* obligations hereunder.

**D. <u>Non-Duplication of Limits-Multiple Coverage Periods</u>**

*Bodily injury* or *property damage* that takes place over more than one policy period will be deemed to have taken place only during the policy period when the *bodily injury or property damage* began, and shall be treated as arising from a single *occurrence*. *Personal injury* that takes place over more than one policy period will be deemed to have taken place only during the policy period when the *personal injury* began, and shall be treated as arising from a single *offense.* *Errors and omissions* that are logically or causally connected by reason of any common fact, circumstance, situation, transaction, event or decision, that take place over more than one policy period will be deemed to have taken place only during the policy period when the *errors and omissions* began, and shall be treated as arising from a single *offense.*

**E. Legal Action Against *Us***

No legal action may be brought against *us* until there has been full compliance with all the terms of this policy.

**F. Other Insurance**

If other collectible insurance is available to the *insured* for a loss *we* cover, *our* obligations are limited as follows:

1. Primary insurance - This insurance is primary except when paragraph 2 below applies. If this insurance is primary, *our* obligations are not affected unless any of the other insurance is also primary. Then, *we* will share with all that other insurance by the method described in paragraph 3 below:

2. Excess insurance - This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

   a. As respects Coverage C, that is effective prior to the Inception Date shown in the Declarations of this insurance and applies to *errors and omissions* on other than a claims-made basis.

   b. That is Fire, Extended Coverage, Builders' Risk, Installation Risk or similar coverage for work or operations performed by *you* or on *your* behalf;

   c. That is Fire insurance for premises rented to *you*.

   d. That is extended to an *insured* by *your* independent contractors, lessees or entities using *your* facilities.

e. As respects Coverage A, that is liability insurance for the ownership, maintenance, operation, loading or unloading, or use of an *automobile* owned by *your* past or present employees, elected or appointed officials, or authorized volunteers, regardless of whether such *automobile* is also hired, leased, or borrowed by *you.*

f. As respects Coverage A, that is liability insurance maintained by an *insured* working in a business of selling, servicing, repairing or parking *automobiles* and then only up to the limits required by Wisconsin financial responsibility law.

g. As respects Coverage A, and except as to *your* liability arising from a statutory duty to indemnify *your* emergency management employees or volunteers for tort liability incurred in their good faith and reasonable performance of emergency management activities, that is liability insurance for the ownership, maintenance, use, loading, or unloading, or operation of an aircraft in which *you* have no ownership interest, regardless of whether such aircraft is hired, leased, or borrowed by *you.*

When this insurance is excess, *we* will have no duty to defend any *claim* or *suit* that any other insurer has a duty to defend. If no other insurer defends a *suit*, *we* will undertake to do so, but *we* will be entitled to the *insured's* rights against all those other insurers.

When this insurance is excess over other insurance, *we* will pay only *our* share of the amount of the loss, if any, that exceeds the sum of:

a. The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

b. The total of all deductible and self-insured amounts under all that other insurance.

*We* will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this policy.

3. Method of sharing - If all of the other insurance permits contribution by equal shares, *we* will follow this method also. Under this approach each insurer contributes equal amounts until it has been paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, *we* will contribute by limits. Under this method, each insurer's share is based on the

ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**G. Premium Determination**

1. *We* will compute all premiums in accordance with *our* rules and rates.

2. Premium shown is the premium for the policy. There will be no premium audit or premium adjustment after the effective date except for added coverage or exposures.

   All premiums are due and payable as determined by *our* Board of Directors.

3. The Named Insured must keep records of the information *we* need for premium computation, and send *us* copies at such times as *we* may request.

4. *We* may examine and audit *your* books and records as they relate to this policy at any time during or after the policy period.

5. The Named Insured shown in the Declarations is responsible for the payment of all premiums and will be the payee for any return premiums *we* pay.

**H. Representations**

By accepting this policy, *you* agree:

1. The statements in the Declarations are accurate and complete;

2. Those statements are based upon representations *you* made to *us*; and

3. *We* have issued this policy in reliance upon *your* representations.

4. No misrepresentation or breach of affirmative warranty made by *you* or on *your* behalf in the negotiation of this policy affects *our* obligation under this policy to third parties unless the *insured* knew or should have known the representation was false and:

   a. *We* rely on it and it is either material or made with intent to deceive; or

   b. The facts misrepresented or falsely warranted contribute to the loss.

5. No failure of a condition before the loss and no breach of a promissory warranty affects *our* obligation under this policy unless such failure or breach:

   a. Exists at the time of the loss; and

   b. Either increases the risk at the time of the loss or contributes to the loss.

The provisions of this condition do not apply to nonpayment of premium.

**I. <u>Separation of *Insureds*</u>**

Except with respect to the Limit of Insurance, and any rights or duties specifically assigned to the first Named Insured, this insurance applies:

1. As if each Named Insured were the only Named Insured; and

2. Separately to each *insured* against whom *claim* is made or *suit* is brought.

**J. <u>Transfer of Rights of Recovery Against Other to *Us*</u>**

In the event of any payment under this policy, *we* will be entitled to the *insured's* rights of recovery against any person or organization and the insured will do whatever is necessary to secure such rights. ( )

**K. <u>When We Do Not Renew</u>**

1. Nonrenewal

   a. If *we* elect not to renew this policy *we* will mail or deliver written notice of nonrenewal to the Named Insured's last mailing address known to *us*. *We* may elect not to renew for any reason; the notice will state the reason for nonrenewal. *We* will mail or deliver the notice at least 60 days before the expiration date of this policy.

   *We* need not mail or deliver the notice if:

   (1) The Named Insured has insured elsewhere;

   (2) The Named Insured has accepted replacement coverage;

   (3) The Named has requested or agreed to nonrenewal of this policy; or

(4) This policy is expressly designated as nonrenewable.

b. *We* may refuse to renew this policy because of the termination of an insurance marketing intermediary's contract with *us* only if the notice of nonrenewal contains an offer to renew the policy with *us* if *we* receive a written request from the Named Insured prior to the renewal date.

c. If the Named Insured fails to pay the renewal or continuation premium by the premium due date, this policy will terminate on the policy expiration or anniversary date, if *we* have:

(1) Given the Named Insured written notice of the renewal or continuation premium not more than 75 days nor less than 10 days prior to the due date of the premium; and

(2) Stated clearly in the notice the effect of nonpayment of premium by the due date.

2. Anniversary Alteration

If this policy is written for a term of more than one year or has no fixed expiration date, *we* may alter the terms or premiums of this policy by mailing or delivering written notice of less favorable terms or premiums to the Named Insured's last mailing address known to *us. We* will mail, by first class mail, or deliver this notice at least 60 days prior to the anniversary date.

If *we* notify the Named Insured within 60 days prior to the anniversary date, the new terms or premiums will not take effect until 60 days after the notice was mailed or delivered. The notice will include a statement of the Named Insured's right to cancel. The Named Insured may elect to cancel the policy at any time during the 60 day period, in accordance with Paragraph 1. of the Cancellation Condition. If the first Named Insured elects to cancel the policy during the 60day period, return premiums or additional premium charges will be calculated proportionately on the basis of the old premiums.

3. Renewal With Altered Terms

a. If *we* elect to renew this policy but on less favorable terms or at higher premiums, *we* will mail or deliver written notice of the new terms or premiums to the Named Insured's last mailing address known to *us. We* will mail, by first class mail, or deliver this notice at least 60 days prior to the renewal date.

b. If *we* notify the Named Insured within 60 days prior to the renewal date, the new terms or premiums will not take effect until 60 days after the notice was mailed or delivered, in which case the Named Insured may elect to cancel the renewal policy at any time during the 60 day period in accordance with paragraph 1 of the Cancellation Condition. The notice will include a statement of the Named Insured's right to cancel. If the first Named Insured elects to cancel the renewal policy during the 60 day period, return premiums or additional premium charges will be calculated proportionately on the basis of the old premiums.

*We* need not mail or deliver this notice if the only change adverse to the Named Insured is a premium increase that:

a. Is less than 25% and is generally applicable to the class of business to which this policy belongs; or

b. Results from a change based on an insured's action that alters the nature or extent of the risk insured against, including but not limited to a change in the classification or the units of exposure, or increased policy coverage.

## L. <u>Cancellation</u>

1. The Named Insured shown in the Declarations may cancel this policy by mailing or delivering to *us* 6 months advance written notice of cancellation.

2. *We* may cancel this policy by mailing or delivering to the Named Insured written notice of cancellation at least 10 days before the effective date of cancellation.

   If this policy has been in effect for less than 60 days and is not a renewal policy, *we* may cancel for any reason.

   If this policy has been in effect for 60 days or more or is a renewal of a policy *we* issued, except as provided in Paragraph 7 below, *we* may cancel this policy only for one or more of the following reasons:

   a. The policy was obtained by material misrepresentation;

   b. There has been a substantial change in the risk *we* originally assumed, except to the extent that we should have foreseen the

change or considered the risk in writing the policy;

c. There have been substantial breaches of contractual duties, conditions or warranties; or

d. Nonpayment of premium.

If this policy has been in effect for 60 days or more or is a renewal of a policy *we* issued, the notice of cancellation will state the reason for cancellation.

3. *We* will mail or deliver *our* notice to the Named Insured's last mailing address known to *us*.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, *we* will send the Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

7. Anniversary Cancellation

If this policy is written for a term of more than one year or has no fixed expiration date, *we* may cancel this policy for any reason by mailing or delivering to the Named Insured written notice of cancellation at least 60 days before the anniversary date of the policy. Such cancellation will be effective on the policy's anniversary date.

*We* may cancel this policy because of the termination of an insurance marketing intermediary's contract with *us* only if the notice of cancellation contains an offer to continue the policy with *us* if *we* receive a written request from the Named Insured prior to the date of cancellation.

8. With respect to automobile insurance provided under this policy, *we* will not cancel or refuse to renew coverage wholly or partially because of age, sex, residence, race, color, creed, religion, national origin, ancestry, marital status or occupation of anyone who is an *insured*.

**M. <u>Conformity To Statute Or Rule</u>**

Any provision of this policy (including endorsements which modify this policy)

that is in conflict with a Wisconsin statute or rule is hereby amended to conform to that statute or rule. The term rule means a valid rule promulgated by the Commissioner of Insurance in accordance with the rule-making authority conferred under Wis. Stat. Sec. 227.11(2) and published in the Wisconsin Administrative Code.

As respects coverage afforded under Section I, Coverage A -*Bodily Injury* and *Property Damage, arising from* an *insured's ownership, mainten*ance, or use of an automobile outside the State of Wisconsin, *we* will provide the minimum amounts and types of other coverages, such as "no-fault," required for out-of-state vehicles by the jurisdiction where the *automobile* is being used.

**N.** **Changes**

This policy contains all the coverage agreements between *you* and *us* concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with *our* consent. This policy's terms can be amended or waived only by endorsement issued by *us* and made a part of this policy.

If one of *our* agents knows of a fact that breaches a condition of this policy, *we* will be considered to have knowledge of this same fact if:

1. The agent knows of this fact at the time the policy is issued or an application is made; or

2. The agent later learns of this fact in the course of his dealings as an agent with *you*.

   Any fact that breaches a condition of this policy and is known to the agent prior to loss shall not void the policy or prevent a recovery in the event of loss.

**O.** **Inspection**

At *our* option, *we* may inspect *your* property and operations at any time. These inspections are for *our* benefit only. By *our* right to inspect or by *our* making any inspection, *we* make no representation that *your* property or operations are safe, are not harmful to health or comply with any law, rule or regulation.

**P.** **Transfer of *Your* Interest in This Policy**

*Your* rights and duties under this policy may not be transferred without *our* written consent.

**Q.** **Annual Policy Holder's Meeting**

An announcement of the date, time and place for the Annual Policy Holder's Meeting will be given to each policy holder at least sixty days in advance of the meeting. The announcement will be addressed to the County Board Chairperson and the County Clerk if the policy holder is a Wisconsin County Government or to the person and location invoiced if the policy holder is other than a Wisconsin County Government.

This policy is signed at Madison, Wisconsin on behalf of Wisconsin County Mutual Insurance Corporation by its President and Secretary.

| | |
|---|---|
| Willie Johnson, Jr. | Thomas Wegner |
| Chairman | Secretary |
| 1/23/2024 | Karen Flynn |
| Date | Authorized Agent |

**WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION**

**CYBER ENHANCEMENT ENDORSEMENT**

**NAMED INSURED:** Price County **POLICY #:** 15124

**POLICY PERIOD**: 1/1/2024 to 1/1/2025 **EFFECTIVE DATE:** 1/1/2024

**THIS ENDORSEMENTS LIABILITY INSURING AGREEMENTS PROVIDE COVERAGE ON A CLAIMS MADE AND REPORTED BASIS AND APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE ENDORSEMENT PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO US IN ACCORDANCE WITH THE TERMS OF THIS ENDORSEMENT. AMOUNTS INCURRED AS CLAIMS EXPENSES UNDER THIS ENDORSEMENT WILL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO RETENTIONS. CERTAIN COVERAGES REQUIRE OUR PRIOR CONSENT OR APPROVAL. PLEASE READ THIS ENDORSEMENT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**PUBLIC ENTITY LIABILITY INSURANCE**

The following Table lists the Limits of Insurance provided under this endorsement. For details on specific coverage, consult the actual endorsement wording.

**SUPPLEMENTAL COVERAGE TABLE**

| | **Endorsement Aggregate Limit - $1,000,000** | **Retention** | **Retro Date** |
|---|---|---|---|
| **FIRST PARTY LOSS:** | | | |
| Business Interruption Loss | $ 500,000 each incident | $10,000 | Not Applicable |
| Cyber Extortion Loss | $ 500,000 each incident | $10,000 | Not Applicable |
| Data Recovery Costs | $ 500,000 each incident | $10,000 | Not Applicable |
| Reputation Loss | $ 500,000 each incident | $10,000 | Not Applicable |
| **LIABILITY:** | | | |
| Data & Network Liability | $ 1,000,000 each claim | $10,000 | Not Applicable |
| Regulatory Defense & Costs | $ 50,000 each claim | $10,000 | Not Applicable |
| Payment Card Liabilities & Costs | $ 50,000 each claim | $10,000 | Not Applicable |
| Media Liability | $ 1,000,000 each claim | $10,000 | Not Applicable |
| **ECrime:** | | | |
| Fraudulent Instruction | $ 500,000 each loss | $10,000 | Not Applicable |
| Funds Transfer Fraud | $ 500,000 each loss | $10,000 | Not Applicable |
| Telephone Fraud | $ 500,000 each loss | $10,000 | Not Applicable |
| Criminal Reward | $ 25,000 each loss | $10,000 | Not Applicable |
| Breach Response Aggregate Limit of Coverage | $ 1,000,000 each incident | $10,000 | Not Applicable |

We, rely upon the statements in the **Application**, which is deemed incorporated into this endorsement and forms a part hereof, and in consideration of the payment of the premium, agrees with the **Insured** as follows:

**THIS ENDORSEMENT'S LIABILITY INSURING AGREEMENTS PROVIDE COVERAGE ON A CLAIMS MADE AND**

**REPORTED BASIS AND APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE ENDORSEMENT PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO US IN ACCORDANCE WITH THE TERMS OF THIS ENDORSEMENT. AMOUNTS INCURRED AS CLAIMS EXPENSES UNDER THIS ENDORSEMENT WILL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO RETENTIONS. CERTAIN COVERAGES REQUIRE OUR PRIOR CONSENT OR APPROVAL. PLEASE READ THIS ENDORSEMENT CAREFULLY.**

This Breach Response Endorsement is added to the Policy and the terms and conditions of this Endorsement govern the scope of coverage and your and our duties. This Endorsement amends the Policy to provide breach response coverage. Various provisions in this Endorsement restrict coverage. Read the entire Endorsement carefully to determine your rights and duties and what is and is not covered. The terms, conditions, exclusions and limits of liability set forth in this Endorsement apply only to the coverage provided by this Endorsement.

The words **we**, **us** and **our** refer to the company providing this coverage. The term **Policy** refers to the policy to which this Endorsement is attached. Words and phrases that appear in **bold** have special meaning. Refer to **DEFINITIONS**. To the extent any words or phrases used in this Endorsement are defined elsewhere in the Policy, such definitions provided elsewhere do not apply to give meaning to the words or phrases used in this Endorsement.

The terms and conditions of the Cancellation provision of the Policy, and any amendment to such terms, are incorporated herein and shall apply to coverage as is afforded by this Endorsement, unless specifically stated otherwise in an endorsement(s) attached hereto.

We agree with the **Named Insured**, in consideration of the payment of the premium and reliance upon the statements contained in the information and materials provided to us in connection with the underwriting and issuance of this Endorsement and subject to all the provisions, terms and conditions of this Endorsement:

## SECTION I – INSURING AGREEMENTS

### Breach Response

To provide **Breach Response Services** to the **Insured Organization** because of an actual or reasonably suspected **Data Breach** or **Security Breach** that the **Insured** first discovers during the **Endorsement Period**.

### First Party Loss

To indemnify the **Insured Organization** for:

*Business Interruption Loss*

**Business Interruption Loss** that the **Insured Organization** sustains as a result of a **Security Breach** that the **Insured** first discovers during the **Endorsement Period**.

*Cyber Extortion Loss*

**Cyber Extortion Loss** that the **Insured Organization** incurs as a result of an **Extortion Threat** first made against the **Insured Organization** during the **Endorsement Period**.

*Data Recovery Costs*

**Data Recovery Costs** that the **Insured Organization** incurs as a direct result of a **Security Breach** that the **Insured** first discovers during the **Endorsement Period**.

*Reputational Loss*

**Reputational Loss** that the **Insured Organization** incurs during the **Notification Period** as a result of (i) an actual or reasonably suspected **Data Breach** or **Security Breach** that the **Insured Organization** first discovers during the **Endorsement Period** and (ii) for which individuals have been notified pursuant to part 4. of the **Breach Response Services** definition.

**Liability**

*Data & Network Liability*

To pay **Damages** and **Claims Expenses**, which the **Insured** is legally obligated to pay because of any **Claim** first made against any **Insured** during the **Endorsement Period** for:

1. a **Data Breach**;

2. a **Security Breach**;

3. the **Insured Organization's** failure to timely disclose a **Data Breach** or **Security Breach**;

4. failure by the **Insured** to comply with that part of a **Privacy Policy** that specifically:

   (a) prohibits or restricts the **Insured Organization's** disclosure, sharing or selling of **Personally Identifiable Information**;

   (b) requires the **Insured Organization** to provide an individual access to **Personally Identifiable Information** or to correct incomplete or inaccurate **Personally Identifiable Information** after a request is made; or

   (c) mandates procedures and requirements to prevent the loss of **Personally Identifiable Information**;

   provided the **Insured Organization** has in force, at the time of such failure, a **Privacy Policy** that addresses those subsections above that are relevant to such **Claim.**

*Regulatory Defense & Penalties*

To pay **Penalties** and **Claims Expenses**, which the **Insured** is legally obligated to pay because of a **Regulatory Proceeding** first made against any **Insured** during the **Endorsement Period** for a **Data Breach** or a **Security Breach**.

*Payment Card Liabilities & Costs*

To indemnify the **Insured Organization** for **PCI Fines, Expenses and Costs** which it is legally obligated to pay because of a **Claim** first made against any **Insured** during the **Endorsement Period.**

*Media Liability*

To pay **Damages** and **Claims Expenses**, which the **Insured** is legally obligated to pay because of any **Claim** first made against any **Insured** during the **Endorsement Period** for **Media Liability**.

**eCrime**

To indemnify the **Insured Organization** for any direct financial loss sustained resulting from:

1. **Fraudulent Instruction**;

2. **Funds Transfer Fraud**; or

3. **Telephone Fraud**;

that the **Insured** first discovers during the **Endorsement Period** or to indemnify the **Insured Organization** for **Criminal Reward Funds.**

## SECTION II – DEFINITIONS

**Additional Insured** means any person or entity that the **Insured Organization** has agreed in writing to add as an **Additional Insured** under the Policy or Endorsement prior to the commission of any act for which such person or entity would be provided coverage under this Endorsement, but only to the extent the **Insured Organization** would have been liable and coverage would have been afforded under the terms and conditions of this Endorsement had such **Claim** been made against the **Insured Organization**.

**Breach Notice Law** means any statute or regulation that requires notice to persons whose personal information was accessed or reasonably may have been accessed by an unauthorized person. **Breach Notice Law** also includes any statute or regulation requiring notice of a **Data Breach** to be provided to governmental or regulatory authorities.

**Breach Response Services** means the following fees and costs in response to an actual or reasonably suspected **Data Breach** or **Security Breach**:

1. for an attorney to provide necessary legal advice to the **Insured Organization** to evaluate its obligations pursuant to **Breach Notice Laws** or a **Merchant Services Agreement** and in connection with providing the **Breach Response Services** described below;

2. for a computer security expert to determine the existence, cause and scope of an actual or reasonably suspected **Data Breach**, and if such **Data Breach** is actively in progress on the **Insured Organization's Computer Systems**, to assist in containing it;

3. for a PCI Forensic Investigator to investigate the existence and extent of an actual or reasonably suspected **Data Breach** involving payment card data and for a Qualified Security Assessor to certify and assist in attesting to the **Insured Organization's** PCI compliance, as required by a **Merchant Services Agreement**;

4. to notify those individuals whose **Personally Identifiable Information** was potentially impacted by a **Data Breach**;

5. to provide a call center to respond to inquiries about a **Data Breach**;

6. to provide a credit monitoring, identity monitoring or other solution approved by us to individuals whose **Personally Identifiable Information** was potentially impacted by a **Data Breach**; and

7. public relations and crisis management costs directly related to mitigating harm to the **Insured Organization** which are approved in advance by us in our discretion.

**Breach Response Services** will be provided by providers chosen by us, from our panel, in consultation with the **Insured**, will be subject to the terms and conditions of this Endorsement, and will not include any internal salary or overhead expenses of the **Insured Organization**.

**Business Interruption Loss** means:

1. **Income Loss**;

2. **Forensic Expenses**; and

3. **Extra Expense**;

actually sustained during the **Period of Restoration** as a result of the actual interruption of the **Insured Organization's** business operations caused by a **Security Breach**. Coverage for **Business Interruption Loss** will apply only after the **Waiting Period** has elapsed.

**Business Interruption Loss** will not include (i) loss arising out of any liability to any third party; (ii) legal costs or legal expenses; (iii) loss incurred as a result of unfavorable business conditions; (iv) loss of market or any other consequential loss; or (v) **Data Recovery Costs**.

**Claim** means:

1. a written demand received by any **Insured** for money or services;

2. with respect to coverage provided under the Regulatory Defense & Penalties insuring agreement only, institution of a **Regulatory Proceeding** against any **Insured**; and

3. with respect to coverage provided under part 1. of the Data & Network Liability insuring agreement only, a demand received by any **Insured** to fulfill the **Insured Organization's** contractual obligation to provide notice of a **Data Breach** pursuant to a **Breach Notice Law**;

Multiple **Claims** arising from the same or a series of related, repeated or continuing acts, errors, omissions or events will be considered a single **Claim** for the purposes of this Endorsement. All such **Claims** will be deemed to have been made at the time of the first such **Claim.**

**Claims Expenses** means:

1. all reasonable and necessary legal costs and expenses resulting from the investigation, defense and appeal of a **Claim**, if incurred by us, or by the **Insured** with our prior written consent.; and

2. the premium cost for appeal bonds for covered judgments or bonds to release property used to secure a legal obligation, if required in any **Claim** against an **Insured**; provided we will have no obligation to appeal or to obtain bonds.

**Claims Expenses** will not include any salary, overhead, or other charges by the **Insured** for any time spent in cooperating in the defense and investigation of any **Claim** or circumstance that might lead to a **Claim** notified under this Endorsement, or costs to comply with any regulatory orders, settlements or judgments.

**Computer Systems** means computers, any software residing on such computers and any associated devices or equipment:

1. operated by and either owned by or leased to the **Insured Organization**; or

2. with respect to coverage under the Breach Response and Liability insuring agreements, operated by a third party pursuant to written contract with the **Insured Organization** and used for the purpose of providing hosted computer application services to the **Insured Organization** or for processing, maintaining, hosting or storing the **Insured Organization's** electronic data.

**Control Group** means any principal, partner, corporate officer, director, general counsel (or most senior legal counsel) or risk manager of the **Insured Organization** and any individual in a substantially similar position.

**Criminal Reward Funds** means any amount offered and paid by the **Insured Organization** with our prior written consent for information that leads to the arrest and conviction of any individual(s) committing or trying to commit any illegal act related to any coverage under this Endorsement; but will not include any amount based upon information provided by the **Insured**, the **Insured's** auditors or any individual hired or retained to investigate the illegal acts. All **Criminal Reward Funds** offered pursuant to this Endorsement must expire no later than 6 months following the end of the **Endorsement Period.**

**Cyber Extortion Loss** means:

1. any **Extortion Payment** that has been made by or on behalf of the **Insured Organization** with our prior written consent to prevent or terminate an **Extortion Threat**; and

2. reasonable and necessary expenses incurred by the **Insured Organization** with our prior written consent to prevent or respond to an **Extortion Threat.**

**Damages** means a monetary judgment, award or settlement, including any award of prejudgment or post-judgment interest; but **Damages** will not include:

1. future profits, restitution, disgorgement of unjust enrichment or profits by an **Insured**, or the costs of complying with orders granting injunctive or equitable relief;

2. return or offset of fees, charges or commissions charged by or owed to an **Insured** for goods or services already provided or contracted to be provided;

3. taxes or loss of tax benefits;

4. fines, sanctions or penalties;

5. punitive or exemplary damages or any damages which are a multiple of compensatory damages, unless insurable by law in any applicable venue that most favors coverage for such punitive, exemplary or multiple damages;

6. discounts, coupons, prizes, awards or other incentives offered to the **Insured's** customers or clients;

7. liquidated damages, but only to the extent that such damages exceed the amount for which the **Insured** would have been liable in the absence of such liquidated damages agreement;

8. fines, costs or other amounts an **Insured** is responsible to pay under a **Merchant Services Agreement**; or

9. any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured**.

**Data** means any software or electronic data that exists in **Computer Systems** and that is subject to regular back-up procedures.

**Data Breach** means the theft, loss, or **Unauthorized Disclosure** of **Personally Identifiable Information** or **Third Party Information** that is in the care, custody or control of the **Insured Organization** or a third party for whose theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Information** or **Third Party Information** the **Insured Organization** is liable.

**Data Recovery Costs** means the reasonable and necessary costs incurred by the **Insured Organization** to regain access to, replace, or restore **Data**, or if **Data** cannot reasonably be accessed, replaced, or restored, then the reasonable and necessary costs incurred by the **Insured Organization** to reach this determination.

**Data Recovery Costs** will not include: (i) the monetary value of profits, royalties, or lost market share related to **Data**, including but not limited to trade secrets or other proprietary information or any other amount pertaining to the value of **Data**; (ii) legal costs or legal expenses; (iii) loss arising out of any liability to any third party; (iv) **Cyber Extortion Loss** or (v) any of the **Insured Organization's** internal salary or overhead expenses.

**Digital Currency** means a type of digital currency that:

1. requires cryptographic techniques to regulate the generation of units of currency and verify the transfer thereof;

2. is both stored and transferred electronically; and

3. operates independently of a central bank or other central authority.

**Endorsement Period** means the period of time between the effective date listed on the Endorsement and the effective date of termination, expiration or cancellation of this Endorsement and specifically excludes any Optional Extension Period or any prior **Endorsement Period** or renewal period.

**Extortion Payment** means **Money**, **Digital Currency**, marketable goods or services demanded to prevent or

terminate an **Extortion Threat**.

**Extortion Threat** means a threat to:

1. alter, destroy, damage, delete or corrupt **Data**;
2. perpetrate the **Unauthorized Access or Use** of **Computer Systems**;
3. prevent access to **Computer Systems** or **Data**;
4. steal, misuse or publicly disclose **Data**, **Personally Identifiable Information** or **Third Party Information**;
5. introduce malicious code into **Computer Systems** or to third party computer systems from **Computer Systems**; or
6. interrupt or suspend **Computer Systems**;

unless an **Extortion Payment** is received from or on behalf of the **Insured Organization**.

**Extra Expense** means reasonable and necessary expenses incurred by the **Insured Organization** during the **Period of Restoration** to minimize, reduce or avoid **Income Loss**, over and above those expenses the **Insured Organization** would have incurred had no **Security Breach** occurred.

**Financial Institution** means a bank, credit union, saving and loan association, trust company or other licensed financial service, securities broker-dealer, mutual fund, or liquid assets fund or similar investment company where the **Insured Organization** maintains a bank account.

**Forensic Expenses** means reasonable and necessary expenses incurred by the **Insured Organization** to investigate the source or cause of a **Business Interruption Loss**.

**Fraudulent Instruction** means the transfer, payment or delivery of **Money** or **Securities** by an **Insured** as a result of fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions provided by a third party, that is intended to mislead an **Insured** through the misrepresentation of a material fact which is relied upon in good faith by such **Insured**.

**Fraudulent Instruction** will not include loss arising out of:

1. fraudulent instructions received by the **Insured** which are not first authenticated via a method other than the original means of request to verify the authenticity or validity of the request;
2. any actual or alleged use of credit, debit, charge, access, convenience, customer identification or other cards;
3. any transfer involving a third party who is not a natural person **Insured**, but had authorized access to the **Insured's** authentication mechanism;
4. the processing of, or the failure to process, credit, check, debit, personal identification number debit, electronic benefit transfers or mobile payments for merchant accounts;
5. accounting or arithmetical errors or omissions, or the failure, malfunction, inadequacy or illegitimacy of any product or service;
6. any liability to any third party, or any indirect or consequential loss of any kind;
7. any legal costs or legal expenses; or
8. proving or establishing the existence of **Fraudulent Instruction**.

**Funds Transfer Fraud** means the loss of **Money** or **Securities** contained in a **Transfer Account** at a **Financial Institution** resulting from fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions by a third party issued to a **Financial Institution** directing such institution to transfer, pay or deliver **Money** or **Securities** from any account maintained by the **Insured Organization** at such institution, without the **Insured Organization's** knowledge or consent.

**Funds Transfer Fraud** will not include any loss arising out of:

1. the type or kind covered by the **Insured Organization's** financial institution bond or commercial crime policy;

2. any actual or alleged fraudulent, dishonest or criminal act or omission by, or involving, any natural person **Insured**;

3. any indirect or consequential loss of any kind;

4. punitive, exemplary or multiplied damages of any kind or any fines, penalties or loss of any tax benefit;

5. any liability to any third party, except for direct compensatory damages arising directly from **Funds Transfer Fraud**;

6. any legal costs or legal expenses; or proving or establishing the existence of **Funds Transfer Fraud**;

7. the theft, disappearance, destruction of, unauthorized access to, or unauthorized use of confidential information, including a PIN or security code;

8. any forged, altered or fraudulent negotiable instruments, securities, documents or instructions; or

9. any actual or alleged use of credit, debit, charge, access, convenience or other cards or the information contained on such cards.

**Income Loss** means an amount equal to:

1. net profit or loss before interest and tax that the **Insured Organization** would have earned or incurred; and

2. continuing normal operating expenses incurred by the **Insured Organization** (including payroll), but only to the extent that such operating expenses must necessarily continue during the **Period of Restoration.**

**Individual Contractor** means any natural person who performs labor or service for the **Insured Organization** pursuant to a written contract or agreement with the **Insured Organization.** The status of an individual as an **Individual Contractor** will be determined as of the date of an alleged act, error or omission by any such **Individual Contractor.**

**Insured** means:

1. the **Insured Organization**;

2. any director or officer of the **Insured Organization**, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

3. an employee (including a part time, temporary, leased or seasonal employee or volunteer) or **Individual Contractor** of the **Insured Organization**, but only for work done while acting within the scope of his or her employment and related to the conduct of the **Insured Organization's** business;

4. a principal if the **Named Insured** is a sole proprietorship, or a partner if the **Named Insured** is a partnership, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

5. any person who previously qualified as an **Insured** under parts 2. - 4., but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

6. the estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Endorsement;

7. the lawful spouse, including any natural person qualifying as a domestic partner of any **Insured**, but solely by reason of any act, error or omission of an **Insured** other than such spouse or domestic partner; and

8. an **Additional Insured**, but only as respects **Claims** against such person or entity for acts, errors or omissions of the **Insured Organization**.

**Insured Organization** means the **Named Insured** and any **Subsidiaries**.

**Loss** means **Breach Response Services**, **Business Interruption Loss**, **Claims Expenses**, **Criminal Reward Funds**, **Cyber Extortion Loss**, **Damages**, **Data Recovery Costs**, **PCI Fines, Expenses and Costs**, **Penalties**, **Reputational Loss,** loss covered under the eCrime insuring agreement and any other amounts covered under this Endorsement.

Multiple **Losses** arising from the same or a series of related, repeated or continuing acts, errors, omissions or events will be considered a single **Loss** for the purposes of this Endorsement.

With respect to the Breach Response and First Party Loss insuring agreements, all acts, errors, omissions or events (or series of related, repeated or continuing acts, errors, omissions or events) giving rise to a **Loss** or multiple **Losses** in connection with such insuring agreements will be deemed to have been discovered at the time the first such act, error, omission or event is discovered.

**Media Liability** means one or more of the following acts committed by, or on behalf of, the **Insured Organization** in the course of creating, displaying, broadcasting, disseminating or releasing **Media Material** to the public:

1. defamation, libel, slander, product disparagement, trade libel, infliction of emotional distress, outrage, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any person or organization;

2. a violation of the rights of privacy of an individual, including false light, intrusion upon seclusion and public disclosure of private facts;

3. invasion or interference with an individual's right of publicity, including commercial appropriation of name, persona, voice or likeness;

4. plagiarism, piracy, or misappropriation of ideas under implied contract;

5. infringement of copyright;

6. infringement of domain name, trademark, trade name, trade dress, logo, title, metatag, or slogan, service mark or service name;

7. improper deep-linking or framing;

8. false arrest, detention or imprisonment;

9. invasion of or interference with any right to private occupancy, including trespass, wrongful entry or eviction; or

10. unfair competition, if alleged in conjunction with any of the acts listed in parts 5. or 6. above.

**Media Material** means any information, including words, sounds, numbers, images or graphics, but will not include computer software or the actual goods, products or services described, illustrated or displayed in such **Media Material**.

**Merchant Services Agreement** means any agreement between an **Insured** and a financial institution, credit/debit card company, credit/debit card processor or independent service operator enabling an **Insured** to accept credit card, debit card, prepaid card or other payment cards for payments or donations.

**Money** means a medium of exchange in current use authorized or adopted by a domestic or foreign government as a part of its currency.

**Named Insured** means the Named Insured listed on the Coverage Endorsement.

**Notification Period** means the 30-day period that begins on the specific date on which notified individuals first receive notification of the incident for which notification services are provided.

**PCI Fines, Expenses and Costs** means the monetary amount owed by the **Insured Organization** under the terms of a **Merchant Services Agreement** as a direct result of a suspected **Data Breach**. With our prior consent, **PCI Fines, Expenses and Costs** includes reasonable and necessary legal costs and expenses incurred by the **Insured Organization** to appeal or negotiate an assessment of such monetary amount. **PCI Fines, Expenses and Costs** will not include any charge backs, interchange fees, discount fees or other fees unrelated to a **Data Breach**.

**Penalties** means:

1. any monetary civil fine or penalty payable to a governmental entity that was imposed in a **Regulatory Proceeding**; and

2. amounts which the **Insured** is legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Proceeding** (including such amounts required to be paid into a Consumer Redress Fund);

but will not include: (a) costs to remediate or improve **Computer Systems**; (b) costs to establish, implement, maintain, improve or remediate security or privacy practices, procedures, programs or policies; (c) audit, assessment, compliance or reporting costs; or (d) costs to protect the confidentiality, integrity and/or security of **Personally Identifiable Information** or other information.

The insurability of **Penalties** will be in accordance with the law in the applicable venue that most favors coverage for such **Penalties**.

**Period of Restoration** means the 180-day period of time that begins upon the actual and necessary interruption of the **Insured Organization's** business operations.

**Personally Identifiable Information** means:

1. any information concerning an individual that is defined as personal information under any **Breach Notice Law**; and

2. an individual's drivers license or state identification number, social security number, unpublished telephone number, and credit, debit or other financial account numbers in combination with associated security codes, access codes, passwords or PINs; if such information allows an individual to be uniquely and reliably identified or contacted or allows access to the individual's financial account or medical record information.

but will not include information that is lawfully made available to the general public.

**Privacy Policy** means the **Insured Organization's** public declaration of its policy for collection, use, disclosure,

sharing, dissemination and correction or supplementation of, and access to **Personally Identifiable Information**.

**Regulatory Proceeding** means a request for information, civil investigative demand, or civil proceeding brought by or on behalf of any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity.

**Reputational Income Loss** means the net profit resulting directly from the **Insured Organization's** business operations, before income taxes, that the **Insured Organization** is prevented from earning as a direct result of damage to the **Insured Organization's** reputation caused by an actual or reasonably suspected **Data Breach** or **Security Breach**. In determining **Reputational Income Loss**, due consideration shall be given to the prior experience of the **Insured Organization's** business operations before the beginning of the **Notification Period** and to the reasonable and probable business operations the **Insured Organization** could have performed had the actual or reasonably suspected **Data Breach** or **Security Breach** not occurred.

**Reputational Income Loss** does not include any internal salary, costs or overhead expenses of the **Insured Organization**.

**Reputational Loss** means the **Reputational Income Loss** during the **Notification Period**; provided that **Reputational Loss** shall not mean and no coverage shall be available under this endorsement for any of the following: loss arising out of any liability to any third party for whatever reason; legal costs or legal expenses of any type; loss incurred as a result of unfavorable business conditions, loss of market or any other consequential loss; or costs or expenses the **Insured Organization** incurs to identify, investigate, respond to or remediate an actual or reasonably suspected **Data Breach** or **Security Breach**.

**Securities** means negotiable and non-negotiable instruments or contracts representing either **Money** or tangible property that has intrinsic value.

**Security Breach** means a failure of computer security to prevent:

1. **Unauthorized Access or Use** of **Computer Systems**, including **Unauthorized Access or Use** resulting from the theft of a password from a **Computer System** or from any **Insured**;

2. a denial of service attack affecting **Computer Systems**;

3. with respect to coverage under the Liability insuring agreements, a denial of service attack affecting computer systems that are not owned, operated or controlled by an **Insured**; or

4. infection of **Computer Systems** by malicious code or transmission of malicious code from **Computer Systems**.

**Subsidiary** means any entity:

1. which, on or prior to the inception date of this Endorsement, the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding voting securities ("Management Control"); and

2. which the **Named Insured** acquires Management Control after the inception date of this Endorsement; provided that:

   (i) the revenues of such entity do not exceed 15% of the **Named Insured's** annual revenues; or

   (ii) if the revenues of such entity exceed 15% of the **Named Insured's** annual revenues, then coverage under this Endorsement will be afforded for a period of 60 days, but only for any **Claim** that arises out of any act, error, omission, incident or event first occurring after the entity becomes so owned. Coverage beyond such 60 day period will only be available if the **Named Insured** gives us written notice of the acquisition, obtains our written consent to extend coverage to the entity beyond such 60 day period and agrees to pay any additional premium required by us.

This Endorsement provides coverage only for acts, errors, omissions, incidents or events that occur while the **Named Insured** has Management Control over an entity.

**Telephone Fraud** means the act of a third party gaining access to and using the **Insured Organization's** telephone system in an unauthorized manner.

**Third Party Information** means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of information of a third party not insured under this Endorsement which is not available to the general public.

**Transfer Account** means an account maintained by the **Insured Organization** at a **Financial Institution** from which the **Insured Organization** can initiate the transfer, payment or delivery of **Money** or **Securities**.

**Unauthorized Access or Use** means the gaining of access to or use of **Computer Systems** by an unauthorized person(s) or the use of **Computer Systems** in an unauthorized manner.

**Unauthorized Disclosure** means the disclosure of (including disclosure resulting from phishing) or access to information in a manner that is not authorized by the **Insured Organization** and is without knowledge of, consent or acquiescence of any member of the **Control Group**.

**Waiting Period** means the period of time that begins upon the actual interruption of the **Insured Organization's** business operations caused by a **Security Breach**, and ends after the elapse of twelve (12) hours.

**SECTION III – EXCLUSIONS**

The coverage under this Endorsement will not apply to any **Loss** arising out of:

**Bodily Injury or Property Damage**

1. physical injury, sickness, disease or death of any person, including any mental anguish or emotional distress resulting from such physical injury, sickness, disease or death; or

2. physical injury to or destruction of any tangible property, including the loss of use thereof; but electronic data will not be considered tangible property;

**Trade Practices and Antitrust**

any actual or alleged false, deceptive or unfair trade practices, antitrust violation, restraint of trade, unfair competition (except as provided in the Media Liability insuring agreement), or false or deceptive or misleading advertising or violation of the Sherman Antitrust Act, the Clayton Act, or the Robinson-Patman Act; but this exclusion will not apply to:

1. the Breach Response insuring agreement; or

2. coverage for a **Data Breach** or **Security Breach**, provided no member of the **Control Group** participated or colluded in such **Data Breach** or **Security Breach**;

**Gathering or Distribution of Information**

1. the unlawful collection or retention of **Personally Identifiable Information** or other personal information by or on behalf of the **Insured Organization**; but this exclusion will not apply to **Claims Expenses** incurred in defending the **Insured** against allegations of unlawful collection of **Personally Identifiable Information**; or

2. the distribution of unsolicited email, text messages, direct mail, facsimiles or other communications, wire tapping, audio or video recording, or telemarketing, if such distribution, wire tapping, recording or telemarketing is done by or on behalf of the **Insured Organization**; but this exclusion will not apply to **Claims Expenses** incurred in defending the **Insured** against allegations of unlawful audio or video recording;

**Prior Known Acts & Prior Noticed Claims**

1. any act, error, omission, incident or event committed or occurring prior to the inception date of this Endorsement if any member of the **Control Group** on or before the inception date of this Endorsement knew or could have reasonably foreseen that such act, error or omission, incident or event might be expected to be the basis of a **Claim** or **Loss**;

2. any **Claim**, **Loss**, incident or circumstance for which notice has been provided under any prior policy or endorsement of which this Endorsement is a renewal or replacement;

**Racketeering, Benefit Plans, Employment Liability & Discrimination**

1. any actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced and Corrupt Organizations Act or RICO), as amended;

2. any actual or alleged acts, errors or omissions related to any of the **Insured Organization's** pension, healthcare, Welfare, profit sharing, mutual or investment plans, funds or trusts;

3. any employer-employee relations, policies, practices, acts or omissions, or any actual or alleged refusal to employ any person, or misconduct with respect to employees; or

4. any actual or alleged discrimination;

but this exclusion will not apply to coverage under the Breach Response insuring agreement or parts 1., 2. or 3. of the Data & Network Liability insuring agreement that results from a **Data Breach**; provided no member of the **Control Group** participated or colluded in such **Data Breach**;

**Sale or Ownership of Securities & Violation of Securities Laws**

1. the ownership, sale or purchase of, or the offer to sell or purchase stock or other securities; or

2. an actual or alleged violation of a securities law or regulation;

**Criminal, Intentional or Fraudulent Acts**

any criminal, dishonest, fraudulent, or malicious act or omission, or intentional or knowing violation of the law, if committed by an **Insured**, or by others if the **Insured** colluded or participated in any such conduct or activity; but this exclusion will not apply to:

1. **Claims Expenses** incurred in defending any **Claim** alleging the foregoing until there is a final non-appealable adjudication establishing such conduct; or

2. with respect to a natural person **Insured**, if such **Insured** did not personally commit, participate in or know about any act, error, omission, incident or event giving rise to such **Claim** or **Loss**.

For purposes of this exclusion, only acts, errors, omissions or knowledge of a member of the **Control Group** will be imputed to the **Insured Organization**;

**Patent, Software Copyright, Misappropriation of Information**

1. infringement, misuse or abuse of patent or patent rights;

2. infringement of copyright arising from or related to software code or software products other than infringement resulting from a theft or **Unauthorized Access or Use** of software code by a person who is not a past, present or future employee, director, officer, partner or independent contractor of the **Insured Organization**; or

3. use or misappropriation of any ideas, trade secrets or **Third Party Information** (i) by, or on behalf of,

the **Insured Organization**, or (ii) by any other person or entity if such use or misappropriation is done with the knowledge, consent or acquiescence of a member of the **Control Group**;

**Governmental Actions**

a **Claim** brought by or on behalf of any state, federal, local or foreign governmental entity, in such entity's regulatory or official capacity; but this exclusion will not apply to the Regulatory Defense & Penalties insuring agreement;

**Other Insureds & Related Enterprises**

a **Claim** made by or on behalf of:

1. any **Insured**; but this exclusion will not apply to a **Claim** made by an **Additional Insured** or an individual that is not a member of the **Control Group** under the Data & Network Liability insuring agreement; or

2. any business enterprise in which any **Insured** has greater than 15% ownership interest or made by any parent company or other entity which owns more than 15% of the **Named Insured**;

**Trading Losses, Loss of Money & Discounts**

1. any trading losses, trading liabilities or change in value of accounts;

2. any loss, transfer or theft of monies, securities or tangible property of the **Insured** or others in the care, custody or control of the **Insured Organization**;

3. the monetary value of any transactions or electronic fund transfers by or on behalf of the **Insured** which is lost, diminished, or damaged during transfer from, into or between accounts; or

4. the value of coupons, price discounts, prizes, awards, or any other valuable consideration given in excess of the total contracted or expected amount;

but this exclusion will not apply to coverage under the eCrime insuring agreement;

**Media-Related Exposures**

with respect to the Media Liability insuring agreement:

1. any contractual liability or obligation; but this exclusion will not apply to a **Claim** for misappropriation of ideas under implied contract;

2. the actual or alleged obligation to make licensing fee or royalty payments;

3. any costs or expenses incurred or to be incurred by the **Insured** or others for the reprinting, reposting, recall, removal or disposal of any **Media Material** or any other information, content or media, including any media or products containing such **Media Material**, information, content or media;

4. any **Claim** brought by or on behalf of any intellectual property licensing bodies or organizations;

5. the actual or alleged inaccurate, inadequate or incomplete description of the price of goods, products or services, cost guarantees, cost representations, contract price estimates, or the failure of any goods or services to conform with any represented quality or performance;

6. any actual or alleged gambling, contest, lottery, promotional game or other game of chance; or

7. any **Claim** made by or on behalf of any independent contractor, joint venture or venture partner arising

out of or resulting from disputes over ownership of rights in **Media Material** or services provided by such independent contractor, joint venture or venture partner;

**First Party Loss**

with respect to the First Party Loss insuring agreements:

1. seizure, nationalization, confiscation, or destruction of property or data by order of any governmental or public authority;

2. costs or expenses incurred by the **Insured** to identify or remediate software program errors or vulnerabilities or update, replace, restore, assemble, reproduce, recollect or enhance data or **Computer Systems** to a level beyond that which existed prior to a **Security Breach** or **Extortion Threat**;

3. failure or malfunction of satellites or of power, utility, mechanical or telecommunications (including internet) infrastructure or services that are not under the **Insured Organization's** direct operational control; or

4. fire, flood, earthquake, volcanic eruption, explosion, lightning, wind, hail, tidal wave, landslide, act of God or other physical event;

**War and Cyber War**

1. directly or indirectly out of **War**; or

2. from a **Cyber War**;

For the purposes of this exclusion only:

**Cyber War** means any harmful act, or any series of related, repeated or continuing harmful acts, conducted using one or more computers (which includes any software residing on such computer, and any associated devices or equipment) directed against one or more computers (which includes any software residing on such computer, and any associated devices or equipment) that is committed by, or at the direction or under the control of, a sovereign state, and which:

1. is conducted as part of a **War**; or

2. causes a major detrimental impact on:

   (i) the functioning of another sovereign state due to disruption to the availability, delivery or integrity of any **Essential Service** in that other sovereign state; and/or

   (ii) the security or defense of another sovereign state,

provided however that **Cyber War** shall not mean the direct or indirect effect of such harmful act(s) which causes a major detrimental impact on a sovereign state as described in parts 2.(i). and/or 2.(ii) above, on any **Computer Systems** not physically located in a sovereign state which has suffered such major detrimental impact described in parts 2.(i). and/or 2.(ii) above.

**Essential Service** means a service that is essential for the maintenance of vital functions of a sovereign state, including but not limited to financial institutions and associated financial market infrastructure, emergency services, health services, utility services and/or services that are essential for the maintenance of the food, energy and/or transportation sector.

**War** means the use of physical force by a sovereign state against another sovereign state (whether war be declared or not) or as part of a civil war, rebellion, revolution, insurrection and/or military or usurped power.

**Radioactive Contamination**

ionizing radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel;

**Sanction Limitation**

payment of a **Claim** or provision of a benefit that would expose us to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, law or regulations of the European Union, United Kingdom or United States of America.

**Asbestos, Pollution, and Contamination**

either in whole or in part, directly or indirectly, arising out of, resulting from, or in consequence of, or in any way involving:

1. asbestos, or any materials containing asbestos in whatever form or quantity;

2. the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind; any action taken by any party in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins; and any governmental or regulatory order, requirement, directive, mandate or decree that any party take action in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins;

We will have no duty or obligation to defend any **Insured** with respect to any **Claim** or governmental or regulatory order, requirement, directive, mandate or decree which either in whole or in part, directly or indirectly, arises out of or results from or in consequence of, or in any way involves the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind;

3. the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment, or that affects the value, marketability, condition or use of any property; or

4. the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or any governmental, judicial or regulatory directive or request that the **Insured** or anyone acting under the direction or control of the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

**Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant including gas, acids, alkalis, chemicals, heat, smoke, vapor, soot, fumes or **Waste**.

**Waste** includes but is not limited to materials to be recycled, reconditioned or reclaimed.

## SECTION IV – LIMIT OF LIABILITY AND COVERAGE

The Endorsement Aggregate Limit of Liability listed in the Supplemental Coverage Table (the "**Endorsement Aggregate Limit of Liability**") is our combined total limit of liability for all **Loss** payable under this Endorsement.

The limit of liability payable under each insuring agreement will be an amount equal to the **Endorsement Aggregate Limit of Liability** unless another amount is listed in the Supplemental Coverage Table. Such amount is the aggregate amount payable under this Endorsement pursuant to such insuring agreement and is part of, and not in addition to, the **Endorsement Aggregate Limit of Liability**.

The **Breach Response Aggregate Limit of Coverage** listed in the Supplemental Coverage Table (the "**Breach Response Aggregate Limit of Coverage**") is our combined total limit of coverage for all legal, forensic, public relations and crisis management, notification, call center and credit or identity monitoring services payable under

this Endorsement. Coverage under the **Breach Response Aggregate Limit of Coverage** is part of, and not in addition to, the **Endorsement Aggregate Limit of Liability**.

We will not be obligated to pay any **Damages**, **Penalties**, **PCI Fines, Expenses and Costs** or **Claims Expenses,** or to defend any **Claim**, after the **Endorsement Aggregate Limit of Liability** has been exhausted, or after deposit of the **Endorsement Aggregate Limit of Liability** in a court of competent jurisdiction.

**SECTION V – RETENTIONS**

The Retention listed in the Supplemental Coverage Table applies separately to each incident, event or related incidents or events giving rise to a **Claim** or **Loss**. The Retention will be satisfied by monetary payments by the **Named Insured** of covered **Loss** under each insuring agreement. If any **Loss** arising out of an incident or **Claim** is subject to more than one Retention, the Retention for each applicable insuring agreement will apply to such **Loss**, provided that the sum of such Retention amounts will not exceed the largest applicable Retention amount.

Coverage for **Business Interruption Loss** will apply after the **Waiting Period** has elapsed and we will then indemnify the **Named Insured** for all **Business Interruption Loss** sustained during the **Period of Restoration** in excess of the Retention.

Satisfaction of the applicable Retention is a condition precedent to the payment of any **Loss** under this Endorsement, and we will be liable only for the amounts in excess of such Retention.

**SECTION VI – OPTIONAL EXTENSION PERIOD**

Upon non-renewal or cancellation of this Endorsement for any reason except the non-payment of premium, the **Named Insured** will have the right to purchase, for additional premium, an Optional Extension Period of twelve (12) months. Coverage provided by such Optional Extension Period will only apply to **Claims** first made against any **Insured** during the Optional Extension Period and reported to us during the Optional Extension Period, and arising out of any act, error or omission committed before the end of the **Endorsement Period**. In order for the **Named Insured** to invoke the Optional Extension Period option, the payment of the additional premium for the Optional Extension Period must be paid to us within 60 days of the termination of this Endorsement.

The purchase of the Optional Extension Period will in no way increase the **Endorsement Aggregate Limit of Liability** or any sublimit of liability. At the commencement of the Optional Extension Period the entire premium will be deemed earned, and in the event the **Named Insured** terminates the Optional Extension Period for any reason prior to its natural expiration, we will not be liable to return any premium paid for the Optional Extension Period.

**SECTION VII – GENERAL CONDITIONS**

**Notice of Claim or Loss**

The **Insured** must notify us of any **Claim** as soon as practicable, but in no event later than: (i) 60 days after the end of the **Endorsement Period**; or (ii) the end of the Optional Extension Period (if applicable).

With respect to **Breach Response Services**, the **Insured** must notify us of any actual or reasonably suspected **Data Breach** or **Security Breach** as soon as practicable after discovery by the **Insured**, but in no event later than 60 days after the end of the **Endorsement Period**. Notice of an actual or reasonably suspected **Data Breach** or **Security Breach** in conformance with this paragraph will also constitute notice of a circumstance that could reasonably be the basis for a **Claim**.

With respect to **Cyber Extortion Loss**, the **Named Insured** must notify us as soon as practicable after discovery of an **Extortion Threat** but no later than 60 days after the end of the **Endorsement Period**. The **Named Insured** must obtain our consent prior to incurring **Cyber Extortion Loss**.

With respect to **Data Recovery Costs**, **Business Interruption Loss** and **Reputational Loss**, the **Named Insured** must notify us as soon as practicable after discovery of the circumstance, incident or event giving rise to such loss. The **Named Insured** will provide us a proof of **Data Recovery Costs**, **Business Interruption Loss** and **Reputational Loss**. All loss described in this paragraph must be reported, and all

proofs of loss must be provided, to us no later than 6 months after the end of the **Endorsement Period**.

The **Named Insured** must notify us of any loss covered under the eCrime insuring agreement as soon as practicable, but in no event later than 60 days after the end of the **Endorsement Period**.

Any **Claim** arising out of a **Loss** that is covered under the Breach Response, First Party Loss or eCrime insuring agreements and that is reported to us in conformance with the foregoing will be considered to have been made during the **Endorsement Period**.

**Notice of Circumstance**

With respect to any circumstance that could reasonably be the basis for a **Claim** (other than a **Data Breach** or **Security Breach** noticed under the Breach Response insuring agreement) the **Insured** may give written notice of such circumstance to us as soon as practicable during the **Endorsement Period**. Such notice must include:

1. the specific details of the act, error, omission or event that could reasonably be the basis for a **Claim**;

2. the injury or damage which may result or has resulted from the circumstance; and

3. the facts by which the **Insured** first became aware of the act, error, omission or event.

Any subsequent **Claim** made against the **Insured** arising out of any circumstance reported to us in conformance with the foregoing will be considered to have been made at the time written notice complying with the above requirements was first given to Us during the **Endorsement Period**.

**Defense of Claims**

Except with respect to coverage under the Payment Card Liabilities & Costs insuring agreement, We have the right and duty to defend any covered **Claim** or **Regulatory Proceeding**. Defense counsel will be mutually agreed by the **Named Insured** and us but, in the absence of such agreement, our decision will be final.

With respect to the Payment Card Liabilities & Costs insuring agreement, coverage will be provided on an indemnity basis and legal counsel will be mutually agreed by the **Named Insured** and us and will be selected from one of the firms on our panel.

**Settlement of Claims**

If the **Insured** refuses to consent to any settlement recommended by us and acceptable to the claimant, our liability for such **Claim** will not exceed:

1. the amount for which the **Claim** could have been settled, less the remaining Retention, plus the **Claims Expenses** incurred up to the time of such refusal; plus

2. sixty percent (60%) of any **Claims Expenses** incurred after the date such settlement or compromise was recommended to the **Insured** plus sixty percent (60%) of any **Damages**, **Penalties** and **PCI Fines**, **Expenses and Costs** above the amount for which the **Claim** could have been settled;

and we will have the right to withdraw from the further defense of such **Claim**.

The **Insured** may settle any **Claim** where the **Damages**, **Penalties**, **PCI Fines**, **Expenses and Costs** and **Claims Expenses** do not exceed the Retention, provided that the entire **Claim** is resolved and the **Insured** obtains a full release on behalf of all **Insureds** from all claimants.

**Assistance and Cooperation**

We will have the right to make any investigation we deem necessary, and the **Insured** will cooperate with us in all investigations, including investigations regarding coverage under this Endorsement and the information and materials provided to us in connection with the underwriting and issuance of this Endorsement. The

**Insured** will execute or cause to be executed all papers and render all assistance as is requested by us. The **Insured** agrees not to take any action which in any way increases our exposure under this Endorsement. Expenses incurred by the **Insured** in assisting and cooperating with us do not constitute **Claims Expenses** under the Endorsement.

The **Insured** will not admit liability, make any payment, assume any obligations, incur any expense, enter into any settlement, stipulate to any judgment or award or dispose of any **Claim** without our written consent, except as specifically provided in the Settlement of Claims clause above. Compliance with a **Breach Notice Law** will not be considered an admission of liability.

**Subrogation**

If any payment is made under this Endorsement and there is available to us any of the **Insured's** rights of recovery against any other party, then we will maintain all such rights of recovery. The **Insured** will do whatever is reasonably necessary to secure such rights and will not do anything after an incident or event giving rise to a **Claim** or **Loss** to prejudice such rights. If the **Insured** has waived its right to subrogate against a third party through written agreement made before an incident or event giving rise to a **Claim** or **Loss** has occurred, then we waive our rights to subrogation against such third party. Any recoveries will be applied first to subrogation expenses, second to **Loss** paid by us, and lastly to the Retention. Any additional amounts recovered will be paid to the **Named Insured**.

**Other Insurance**

The insurance under this Endorsement will apply as primary over any other valid and collectible insurance available to any **Insured**.

**Action Against Us**

No action will lie against us or our representatives unless and until, as a condition precedent thereto, the **Insured** has fully complied with all provisions, terms and conditions of this Endorsement and the amount of the **Insured's** obligation to pay has been finally determined either by judgment or award against the **Insured** after trial, regulatory proceeding, arbitration or by written agreement of the **Insured**, the claimant, and us.

No person or organization will have the right under this Endorsement to join us as a party to an action or other proceeding against the **Insured** to determine the **Insured's** liability, nor will we be impleaded by the **Insured** or the **Insured's** legal representative.

The **Insured's** bankruptcy or insolvency of the **Insured's** estate will not relieve us of our obligations hereunder.

**Entire Agreement**

By acceptance of the Endorsement, all **Insureds** agree that this Endorsement embodies all agreements between us and the **Insured** relating to this Endorsement. Notice to any agent, or knowledge possessed by any agent or by any other person, will not affect a waiver or a change in any part of this Endorsement or stop us from asserting any right under the terms of this Endorsement; nor will the terms of this Endorsement be waived or changed, except by endorsement issued to form a part of this Endorsement signed by us.

**Assignment**

The interest hereunder of any **Insured** is not assignable. If the **Insured** dies or is adjudged incompetent, such insurance will cover the **Insured's** legal representative as if such representative were the **Insured**, in accordance with the terms and conditions of this Endorsement.

**Singular Form of a Word**

Whenever the singular form of a word is used herein, the same will include the plural when required by context.

**Headings**

The titles of paragraphs, clauses, provisions or endorsements of or to this Endorsement are intended solely for convenience and reference, and are not deemed in any way to limit or expand the provisions to which they relate and are not part of the Endorsement.

**Representation by the Insured**

All **Insureds** agree that the statements contained in the information and materials provided to us in connection with the underwriting and issuance of this Endorsement are true, accurate and are not misleading, and that we issued this Endorsement, and assume the risks hereunder, in reliance upon the truth thereof.

**Named Insured as Agent**

The **Named Insured** will be considered the agent of all **Insureds**, and will act on behalf of all **Insureds** with respect to the giving of or receipt of all notices pertaining to this Endorsement, and the acceptance of any endorsements to this Endorsement. The **Named Insured** is responsible for the payment of all premiums and Retentions and for receiving any return premiums.

**Territory**

This Insurance applies to **Claims** made, acts committed, or **Loss** occurring anywhere in the world.

**Antistacking**

In the event any incident, event or related incidents or events, giving rise to a **Claim**, **Loss** or an obligation to provide **Breach Response Services** triggers coverage under this Endorsement and any other endorsement issued by us, our liability under this Endorsement and such other endorsements combined shall not exceed the amount of the largest **Endorsement Aggregate Limit of Liability** or applicable sublimits of liability.

WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION

DEDUCTIBLE LIABILITY INSURANCE ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following coverage parts if the particular coverage part has been made a part of the policy:**

**Coverage A - *Bodily Injury* and *Property Damage***
**Coverage B - *Personal Injury***
**Coverage C - *Errors and Omissions***

| Coverage | Amount of Deductible |
|---|---|
| ***Bodily Injury, Property Damage, Personal Injury* and *Errors and Omissions*** | **$5,000.00 Per *Occurrence* or *Offense*** |
| **Combined** | **$50,000.00 Annual Aggregate** |

***Our* obligation under the *Bodily Injury, Property Damage, Personal Injury* or *Errors and Omissions* liability coverages or any combination of thereof, to pay damages or *defense costs* on *your* behalf applies only to the amount of damages and defense costs in excess of any deductible amounts stated in the Schedule above as applicable to such coverages, and the limits of insurance applicable to each *occurrence* and to each *offense* for such coverages will be reduced by the amount of such deductible. In no event will *you* be charged for more deductible loss during this policy period than that shown for the annual aggregate deductible. At such time as *your* paid deductible losses for the policy period total an amount equal to the annual aggregate deductible, *your* policy will have no further deductibles applied for this policy period.**

***Your*** Deductible Fund Escrow**, the portion of the total outlay set aside in escrow used to pay damages and *defense costs* incurred during the policy period within the deductible layer, with us will be reconciled semi-annually on a paid loss basis and reconciled on an incurred loss basis at the end of the policy period.**

Named Insured: Price County

Policy Number: 15124 Policy Period: 1/1/2024 - 1/1/2025

WISCONSIN county MUTUAL

**WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION**

**GENERAL ENDORSEMENT**

Named Insured: Price County

Policy Number: 15124 Policy Period: 1/1/2024 - 1/1/2025

**PREMIUM INSTALLMENT ENDORSEMENT**

*We* agree that the advance premium is payable in two equal installments (with additional due to rounding billable on the first installment) and with the installments due and payable on January 1, and July 1, of the policy year.

1/23/2024
Date

Karen Flynn
Authorized Agent

WISCONSIN county MUTUAL

**WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION**

**LEGAL LOSS PREVENTION SERVICES ENDORSEMENT**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

In order to assist *you* in reducing your exposure to certain covered *Losses* related to collective bargaining agreements, and in consideration of the premium charged for your *Policy*, *we* agree to contribute to the cost of qualified *Legal Loss Prevention Services* that *you* incur during your *Policy* period, subject to the terms, conditions, limitations and exclusions stated herein.

| Description | Maximum Annual Contribution | Cost Sharing Each Requested Service |
|---|---|---|
| Legal Loss Prevention Services | $50,000* | 50% of expenses above $2,500 |

* *Our* contribution toward *Legal Loss Prevention Services* is subject to an annual maximum contribution set forth above for all *Legal Loss Prevention Services*.

1. **SECTION I – CONTRIBUTION**

   *We* will contribute toward attorneys' fees and related costs *you* incur during your *Policy* period that relate to *Legal Loss Prevention Services*. *Our* contribution will take the form of fifty percent (50%) of the cost of such qualified *Legal Loss Prevention Services* above the first $2,500.00 of such expense. Any contribution for *Legal Loss Prevention Services* is in addition to, and does not erode any other limits of liability set forth in your *Policy*.

2. **SECTION II – DEFINITIONS**

   *Legal Loss Prevention Services* means attorneys' fees and related costs for matters for which coverage is not otherwise available under this *Policy,* arising out of or related to *collective bargaining disputes*.

   *Collective bargaining disputes* means the negotiation of a collective bargaining agreement and any mediations or arbitrations between *you* and *a union representative* related to such negotiations. *Collective bargaining disputes* exclude any disputes, mediations, arbitrations or lawsuits which pertain to matters that arise after the subject collective bargaining agreement has taken effect.

   *Union representative* means any individual or group of individuals empowered to negotiate on behalf or otherwise represent a labor union.

3. **SECTION III – SELECTION OF COUNSEL**

   *We* have the exclusive right to select counsel to handle any matter for which *you* have given notice of your intent to seek contribution toward *Legal Loss Prevention Services*. *We* also have the right to determine and negotiate hourly rate and reporting requirements for any counsel selected by *us* under this Endorsement.

WISCONSIN county MUTUAL

As respects *Legal Loss Prevention Services*, *we* will pay attorneys' fees and related costs on your behalf, and will bill *you* on a quarterly basis for any amounts that are not eligible for contribution under this Endorsement, including your deductible, any amount above the aggregate limit, and the difference between *our* contribution and the actual fees and costs incurred during such period.

4. **SECTION IV – EXCLUSIONS**

As respects *Legal Loss Prevention Services*, this benefit does not apply to:

i. any matter where *you* are the plaintiff or the party seeking affirmative relief;

ii. any matter which in any way arises out of or is related to a criminal proceeding;

iii. any matter for which *you* seek *Legal Loss Prevention Services* where attorneys are hired without prior authorization by *us*; and

iv. any matter which in any way arises out of or is related to an insurance coverage dispute.

5. **SECTION V – NOTICES**

As respects *Legal Loss Prevention Services:*

*You* will make reasonable efforts to notify *us* as soon as reasonably possible of any matter for which *you* seek contribution toward *Legal Loss Prevention Services*. Notice must be approved through formal action of the County Board and submitted in writing by the County Board Chair or the County Board authorized designee/committee registered with *us*. Notice must include a description of the matter for which *you* seek contribution toward *Legal Loss Prevention Services.*

Nothing in this Endorsement relating to the notice required for *Legal Loss Prevention Services* replaces or modifies in any way *your* duties in the event of an *occurrence*, *offense, claim*, or *suit* under Coverages A, B, or C, as set forth in Section VII-Conditions, A.

**Named Insured:** **Price County**

**Policy Number:** **15124** **Policy Period:** **1/1/2024 - 1/1/2025**

# WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION

## POLICYHOLDER DISCLOSURE
NOTICE OF TERRORISM
INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act of 2002, effective November 26, 2002, that you now have the right to purchase insurance coverage for losses arising out of acts of terrorism, *as defined in Section 102(1) of the Act*: The term “act of terrorism” means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

UNDER THE ACT, ANY IN-FORCE TERRORISM **EXCLUSIONS** FOR ACTS OF TERRORISM, *AS DEFINED IN THE ACT*, ALREADY CONTAINED IN A POLICY OR INCLUDED IN AN ENDORSEMENT ARE NULLIFIED AS OF NOVEMBER 26, 2002. **YOUR POLICY DOES NOT CONTAIN ANY TERRORISM EXCLUSIONS. THEREFORE, THE NULLIFICATION OF TERRORISM EXCLUSIONS DOES NOT AFFECT YOUR POLICY.**

YOU SHOULD KNOW THAT COVERAGE PROVIDED BY THIS POLICY FOR LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM IS PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. UNDER THIS FORMULA, THE UNITED STATES PAYS 90% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. NO ADDITIONAL PREMIUM IS CHARGED FOR INSURED LOSSES COVERED BY THE FEDERAL TERRORISM INSURANCE PROGRAM AND THE FEDERAL SHARE OF LOSSES UNDER THE PROGRAM.

### TERRORISM INSURANCE COVERAGE

**THIS COVERAGE IS AUTOMATICALLY INCLUDED IN YOUR POLICY AND THERE IS NO ADDITIONAL PREMIUM REQUIRED.**

Insured Price County

Policy No: 15124 Endorsement Effective Date 1/1/2024

**WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

**WISCONSIN UNINSURED MOTORIST INSURANCE**

## I. INSURING AGREEMENT

A. We will pay all sums the *insured* is legally entitled to recover as monetary damages from the owner or driver of an *uninsured motor vehicle* because of *bodily injury.* The *bodily injury* must be sustained by the *insured* and must be caused by an *accident.* The owner's or driver's liability for the damages must result from the ownership, maintenance or use of the *uninsured motor vehicle.*

B. If this insurance provides a limit in excess of the amounts required by the applicable law where an *automobile* is principally garaged, we will pay only after all liability bonds or policies have been exhausted by judgments or payments.

C. Any judgment for damages arising out of a *suit* brought without *our* consent is not binding on *us.*

## II. WHO IS AN INSURED

A. *You.*

B. Any person qualifying as an *insured* under the Who Is An Insured provision of the policy while *using* an *automobile* within the scope of his or her employment or authority;

C. Any person qualifying as an *insured* under the Who Is An Insured provision of the policy while *using* with your permission an *automobile* you own, hire or borrow; or

D. Anyone for damages he is entitled to recover because of *bodily injury* sustained by another *insured.*

## III. EXCLUSIONS

This insurance does not apply to:

A. Any *claim* or *suit* settled without *our* consent.

B. The direct or indirect benefit of any insurer or self-insurer under any worker's compensation, disability benefits, or similar law.

C. Anyone *using* an *automobile* without a reasonable belief that the person is entitled to do so.

D. Punitive or exemplary damages.

## IV. LIMIT OF LIABILITY

A. The limits for similar coverage applying to other motor vehicles may not be added to the per person or per accident Uninsured Motorist Limits shown in the Declarations. Regardless of the number of policies involved, vehicles involved, persons covered, claims or *suits* made, vehicles or premiums shown on the policy, or premiums paid, the most *we* will pay under this endorsement for damages to any person for any one *accident* is the per person Uninsured Motorist Limit shown in the Declarations. Regardless of the number of policies involved, vehicles involved, persons covered, claims or *suits* made, vehicles or premium shown on the policy, or premiums paid, the most *we* will pay under this endorsement for damages for any one *accident* is the per accident Uninsured Motorist Limit shown in the Declarations.

B. All *bodily injury* resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one *accident.*

C. No one will be entitled to receive duplicate payments for the same element of damages under this coverage endorsement and any Liability Coverage Form, Uninsured Motorist Coverage, or Underinsured Motorist Coverage.

D. The limits under this policy for Uninsured Motorist Coverage for bodily injury or death resulting from any one *accident* shall be reduced by any of the following that apply:

1. Amounts paid by or on behalf of any person or organization that may be legally responsible for the bodily injury or death for which the payment is made.

2. Amounts paid or payable under any worker's compensation law.

3. Amounts paid or payable under any disability benefits laws.

## V. DEFINITIONS

In addition to the Definitions within the Public Entity Liability Insurance policy, the following words and phrases have special meaning for this Uninsured Motorist Insurance endorsement:

A. *Accident* means an *automobile accident* during the policy period and includes continuous or repeated exposure to the same conditions resulting in *bodily injury* neither expected nor intended from the standpoint of the *insured.*

B. *Uninsured motor vehicle* means a land motor vehicle or trailer, other than a motor vehicle owned by a governmental unit, that is involved in an accident with a person who has uninsured motorist coverage and with respect to which, at the time of the accident, a bodily injury liability insurance policy is not in effect and the owner or operator has not furnished proof of financial responsibility for the future under subch. III of ch. 344 and is not a self-insurer under any other applicable motor vehicle law.

*"Uninsured motor vehicle"* also includes any of the following motor vehicles, other than a motor vehicle owned by a governmental unit, involved in an accident with a person who has uninsured motorist coverage:

1. An insured motor vehicle, or a motor vehicle with respect to which the owner or operator is a self-insurer under any applicable motor vehicle law, if before or after the accident the liability insurer of the motor vehicle, or the self-insurer, is declared insolvent by a court of competent jurisdiction.

2. A phantom motor vehicle, if all of the following apply:

   a. The facts of the accident are corroborated by competent evidence that is provided by someone other than the insured or any other person who makes a claim against the uninsured motorist coverage as a result of the accident.

   b. Within 72 hours after the accident, the insured or someone on behalf of the insured reports the accident to a police, peace, or judicial officer or to the department of transportation or, if the accident occurs outside of Wisconsin, the equivalent agency in the state where the accident occurs.

   c. Within 30 days after the accident occurs, the insured or someone on behalf of the insured files with the insurer a statement under oath that the insured or a legal representative of the insured has a cause of action arising out of the accident for damages against a person whose identity is not ascertainable and setting forth the facts in support of the statement.

3. An unidentified motor vehicle involved in a hit-and-run accident with the person.

C. *"Phantom motor vehicle"* means a motor vehicle to which all of the following apply:

1. The motor vehicle is involved in an accident with a person who has uninsured motorist coverage.

2. In the accident, the motor vehicle makes no physical contact with the insured or with a vehicle the insured is occupying.

3. The identity of neither the operator nor the owner of the motor vehicle can be ascertained.

D. *Using* has the meaning set forth in Wis. Stats. Sec. 632.32(2)(c) and includes driving, operating, manipulating, riding in and any other use.

**VI <u>CHANGES IN CONDITIONS</u>**

The Conditions of the Public Entity Liability Insurance policy are changed for Uninsured Motorist Insurance as follows:

A. Other Insurance is changed as follows:

If there is other applicable uninsured motorist insurance available under one or more policies or provisions of coverage:

WISCONSIN county MUTUAL

1. The maximum recovery under all coverage forms or policies combined may equal but not exceed the highest applicable limits for any three vehicles under any coverage form or policy providing coverage on either a primary or excess basis.

2. The coverage provided by this endorsement with respect to an *automobile you* do not own is excess over any other collectible uninsured motorist insurance available to the *insured.*

B. *Your* Duties in the Event of an *Occurrence, Offense, Claim* or *Suit* is changed by adding the following:

1. Promptly notify the police if a hit-and-run or miss-and-run driver is involved; and

2. Promptly send *us* copies of the legal papers if *suit* is brought.

C. Transfer of *Your* Rights of Recovery Against Others to *Us* is changed by the following:

If *we* make any payment under this uninsured motorist endorsement we are subrogated to the rights of the *insured* against any other party. If *we* make any payment and the *insured* recovers from another party, the *insured* shall hold the proceeds in trust for *us* and pay *us* back the amount *we* have paid. *We* shall be entitled to recovery only after the *insured* has been fully compensated for his or her damages.

D. The following condition is added:

ARBITRATION

1. If *we* and the *insured* disagree whether the *insured* is legally entitled to recover damages from the owner or driver of an *uninsured motor vehicle* or do not agree as to the amount of damages, either party may make a written demand for arbitration. In this event, each party will select an arbitrator. The two arbitrators will elect a third. If they cannot agree within 30 days, either may request that the selection be made by a judge of a court having jurisdiction. Each party will pay the expenses it incurs and bear the expenses of the third arbitrator equally.

2. Unless both parties agree otherwise, arbitration will take place in the county in which the insured lives. Local rules of law as to arbitration procedure and evidence will apply. A decision agreed to by two of the arbitrators will be binding.

3. This condition does not require arbitration of disputes concerning coverage under this endorsement.

| | |
|---|---|
| 1/23/2024 | Karen Flynn |
| Date | Authorized Agent |

# WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION

## GENERAL ENDORSEMENT

Named Insured Price County

Policy Number 15124 Policy Period 1/1/2024 to 1/1/2025

In consideration of the additional premium specified below, coverage as defined by **SECTION VI - DEFINITIONS**, I., defining *personal injury*, is provided to *your* owned and operated airport. This coverage is excess over that provided by any other policy insofar as coverage is provided by both policies.

Annual Net Premium $355.00

1/31/2024
Date

Karen Flynn
Authorized Agent

# WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION

## ADDITIONAL INSURED ENDORSEMENT
## Snowmobile License Agreement

| | |
|---|---|
| Named Insured | **Price County** |
| Date this endorsement takes effect | **1/1/2024** |
| Endorsement Number | **2** |
| Policy Number | **15124** |
| Policy Period | **1/1/2024 to 1/1/2025** |

(*We* will not fill in the above unless *we* issue this endorsement after *we* issue *your* policy.)

IN CONSIDERATION OF AN ADDITIONAL PREMIUM CHARGED OF $25.00, THE FOLLOWING IS HEREBY ADDED AS AN ADDITIONAL INSURED WITH REGARD TO THE RECREATIONAL SNOWMOBILE LICENSE AGREEMENT WITH THE COUNTY.

With regard ONLY to Price County's use, operation, and negligence to Price County maintained recreational trails as defined in the Snowmobile License Agreement.

ADDITIONAL INSURED:

Northwoods ATP, LP
Attn: Few forestry Services Inc.
ATP Client Service

PO Box 3610
Albany, GA 31706-3610

1/31/2024
Date

Karen Flynn
Authorized Agent

WCMIC-END 7721 (4/05)

# WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION

## ADDITIONAL INSURED ENDORSEMENT
## Services Performed

| | |
|---|---|
| Named Insured | **Price County** |
| Date this endorsement takes effect | **1/1/2024** |
| Endorsement Number | **3** |
| Policy Number | **15124** |
| Policy Period | **1/1/2024 to 1/1/2025** |

(*We* will not fill in the above unless *we* issue this endorsement after *we* issue *your* policy.)

IN CONSIDERATION OF AN ADDITIONAL PREMIUM CHARGED OF $25.00, THE FOLLOWING IS HEREBY ADDED AS AN ADDITIONAL INSURED WITH REGARD TO THE FOLLOWING SERVICES PERFORMED:

DESCRIPTION OF SERVICES:

Child Care Memorandum of Understanding agreement with Iron County as the Child Care Fiscal Agency.

ADDITIONAL INSURED: Northern Income Maintenance Consortium
c/o Iron County, Attn: Mark

300 Taconite Street, Suite 201
Hurley, WI 54534

1/31/2024
Date

Karen Flynn
Authorized Agent

WCMIC-END 7715 (4/05)

# WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION

## ADDITIONAL INSURED ENDORSEMENT
## License or Agreement

| | |
|---|---|
| Named Insured | **Price County** |
| Date this endorsement takes effect | **1/1/2024** |
| Endorsement Number | **4** |
| Policy Number | **15124** |
| Policy Period | **1/1/2024 to 1/1/2025** |

(*We* will not fill in the above unless *we* issue this endorsement after *we* issue *your* policy.)

IN CONSIDERATION OF AN ADDITIONAL PREMIUM CHARGED OF $25.00, THE FOLLOWING IS HEREBY ADDED AS AN ADDITIONAL INSURED WITH REGARD TO THE FOLLOWING LICENSE OR AGREEMENT.

LICENSE OR AGREEMENT: Limited Pole Attachment Agreement, extending each year unless terminated by either party, for Price County to attach electric distribution equipment to specific poles owned by Additionsl Insured.

ADDITIONAL INSURED:

Northern States Power Company
d/b/a Xcel Energy
Attn: Tom Breuckman, Manager,
Facility Attachments

825 Rice Street
Saint Paul, MN 55117

1/31/2024
Date

Karen Flynn
Authorized Agent

WCMIC-END 7713 (4/05)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ THIS CAREFULLY.**

# IDENTITY RECOVERY COVERAGE

## IDENTITY THEFT CASE MANAGEMENT SERVICE AND EXPENSE REIMBURSEMENT COVERAGE

Named Insured: Price County

Date this endorsement takes effect: 1/1/2024

Endorsement Number: 5

Policy Number: 15124

Policy Period: 1/1/2024 to 1/1/2025

Premium: $1,260

Throughout this Coverage Endorsement (hereinafter referred to as "IDR Coverage"), words and phrases that appear in quotations have special meaning. Refer to SECTION VI. DEFINITIONS.

The terms and conditions of the Cancellation Condition of the Public Entity Liability Insurance Policy and any amendment to such terms incorporated by endorsement are hereby incorporated herein and shall apply to coverage as is afforded by this IDR Coverage, unless specifically stated otherwise in an endorsement(s) attached hereto.

## SECTION I. WHAT IS COVERED

**Identity Recovery Coverage**

We will provide the Case Management Service and Expense Reimbursement Coverage indicated below if all of the following requirements are met:

1. There has been an "identity theft" involving the personal identity of an "identity recovery insured" under this policy; and
2. Such "identity theft" is first discovered by the "identity recovery insured" during the policy period for which this Identity Recovery Coverage is applicable; and
3. Such "identity theft" is reported to us within 60 days after it is first discovered by the "identity recovery insured".

If all three of the requirements listed above have been met, then "we" will provide the following to the "identity recovery insured":

1. **Case Management Service**

   Services of an "identity recovery case manager" as needed to respond to the "identity theft"; and

2. **Expense Reimbursement**

   Reimbursement of necessary and reasonable "identity recovery expenses" incurred as a direct result of the "identity theft".

This coverage is additional insurance.


© 2017, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

## SECTION II. EXCLUSIONS WHAT IS NOT COVERED

The following additional exclusions apply to this coverage. These exclusions apply to both Case Management Service and Expense Reimbursement Coverage.

We do not cover loss or expense arising from any of the following:

1. The theft of a professional or business identity.
2. Any fraudulent, dishonest or criminal act by an "identity recovery insured" or any person aiding or abetting an "identity recovery insured", or by any authorized representative of an "identity recovery insured", whether acting alone or in collusion with others. However, this exclusion shall not apply to the interests of an “identity recovery insured” who has no knowledge of or involvement in such fraud, dishonesty or criminal act.
3. An “identity theft” that is not reported in writing to the police.

## SECTION III. LIMIT OF LIABILITY

Case Management Service is available as needed for any one “identity theft” for up to 12 consecutive months from the inception of the service. Expenses we incur to provide Case Management Service do not reduce the amount of limit available for Expense Reimbursement Coverage.

Expense Reimbursement Coverage is subject to an Identity Recovery Limit of $25,000 annual aggregate per “identity recovery insured”. The Identity Recovery Limit shall apply separately to each 12 month period within the policy period. For policy periods greater than 12 months, this coverage will be subject to a new and separate Identity Recovery Limit upon each 12 month anniversary of the beginning of the policy period. Regardless of the number of claims, the Identity Recovery Limit is the most we will pay for the total of all loss or expense arising out of all “identity thefts” to any one “identity recovery insured” which are first discovered by the “identity recovery insured” during the present 12 month period. If an “identity theft” is first discovered in one 12 month period and continues into other 12 month periods, all loss and expense arising from such “identity theft” will be subject to the aggregate Identity Recovery Limit applicable to the 12 month period when the “identity theft” was first discovered.

Legal costs as provided under item d. of the definition of “identity recovery expenses” are part of, and not in addition to, the Expense Reimbursement Coverage limit.

Item e. (Lost Wages) and item f. (Child and Elder Care Expenses) of the definition of “identity recovery expenses” are jointly subject to a sublimit of $5,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to wages lost and expenses incurred within 12 months after the first discovery of the “identity theft” by the “identity recovery insured”.

Item g. (Mental Health Counseling) of the definition of “identity recovery expenses” is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to counseling that takes place within 12 months after the first discovery of the “identity theft” by the “identity recovery insured”.

Item h. (Miscellaneous Unnamed Costs) of the definition of “identity recovery expenses” is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to costs incurred within 12 months after the first discovery of the “identity theft” by the “identity recovery insured”.

## SECTION IV. DEDUCTIBLE

IDR Coverage is not subject to a deductible.

© 2017, The Hartford Steam Boiler Inspection and Insurance Company.
All rights reserved.

## SECTION V. CONDITIONS

The following additional conditions apply to this coverage:

**A. Assistance and Claims**

For assistance, the "identity recovery insured" should call the **Identity Recovery Help Line** at **1-833-889-9042**.

The **Identity Recovery Help Line** can provide the "identity recovery insured" with:

1. Information and advice for how to respond to a possible "identity theft"; and
2. Instructions for how to submit a service request for Case Management Service and/or a claim form for Expense Reimbursement Coverage.

   In some cases, we may provide Case Management services at our expense to an "identity recovery insured" prior to a determination that a covered "identity theft" has occurred. Our provision of such services is not an admission of liability under the policy. We reserve the right to deny further coverage or service if, after investigation, we determine that a covered "identity theft" has not occurred.

   As respects Expense Reimbursement Coverage, the "identity recovery insured" must send to us, within 60 days after our request, receipts, bills or other records that support his or her claim for "identity recovery expenses".

**B. Services**

The following conditions apply as respects any services provided by us or our designees to any "identity recovery insured" under this endorsement:

1. Our ability to provide helpful services in the event of an "identity theft" depends on the cooperation, permission and assistance of the "identity recovery insured".
2. All services may not be available or applicable to all individuals. For example, "identity recovery insureds" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions.
3. We do not warrant or guarantee that our services will end or eliminate all problems associated with an "identity theft" or prevent future "identity thefts".

## SECTION VI. DEFINITIONS

1. "Families" means any person related to you by blood, marriage, civil union or adoption who is a resident of your household. This includes a ward or foster child.
2. "Identity Recovery Case Manager means one or more individuals assigned by us to assist an "identity recovery insured" with communications we deem necessary for re-establishing the integrity of the personal identity of the "identity recovery insured". This includes, with the permission and cooperation of the "identity recovery insured", written and telephone communications with law enforcement authorities, governmental agencies, credit agencies and individual creditors and businesses.
3. "Identity Recovery Expenses" means the following when they are reasonable and necessary expenses that are incurred as a direct result of an "identity theft":
   a. Costs for re-filing applications for loans, grants or other credit instruments that are rejected solely as a result of an "identity theft".
   b. Costs for notarizing affidavits or other similar documents, long distance telephone calls and postage solely as a result of your efforts to report an "identity theft" or amend or rectify records as to your true name or identity as a result of an "identity theft".
   c. Costs for credit reports from established credit bureaus.

© 2017, The Hartford Steam Boiler Inspection and Insurance Company.
All rights reserved.

d. Fees and expenses for an attorney approved by us for the following:

(1) The defense of any civil suit brought against an "identity recovery insured".

(2) The removal of any civil judgment wrongfully entered against an "identity recovery insured".

(3) Legal assistance for an "identity recovery insured" at an audit or hearing by a governmental agency.

(4) Legal assistance in challenging the accuracy of the "identity recovery insured's" consumer credit report.

(5) The defense of any criminal charges brought against an "identity recovery insured" arising from the actions of a third party using the personal identity of the "identity recovery insured".

e. Actual lost wages of the "identity recovery insured" for time reasonably and necessarily taken away from work and away from the work premises. Time away from work includes partial or whole work days. Actual lost wages may include payment for vacation days, discretionary days, floating holidays and paid personal days. Actual lost wages does not include sick days or any loss arising from time taken away from self-employment. Necessary time off does not include time off to do tasks that could reasonably have been done during non-working hours.

f. Actual costs for supervision of children or elderly or infirm relatives or dependents of the "identity recovery insured" during time reasonably and necessarily taken away from such supervision. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured".

g. Actual costs for counseling from a licensed mental health professional. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured".

h. Any other reasonable costs necessarily incurred by an "identity recovery insured" as a direct result of the "identity theft".

(1) Such costs include:

(A) Costs by the "identity recovery insured" to recover control over his or her personal identity.

(B) Deductibles or service fees from financial institutions.

(2) Such costs do not include:

(A) Costs to avoid, prevent or detect "identity theft" or other loss.

(B) Money lost or stolen.

(C) Costs that are restricted or excluded elsewhere in this endorsement or policy.

4. "Identity Recovery Insured" means any person, who at the time of the discovery of the "identity theft" is an active full or part-time employee, elected or appointed official, or authorized volunteer of the insured and their "families". An "identity recovery insured" and their "families" must always be an individual person. The entity insured under this policy is not an "identity recovery insured".

5. "Identity Theft" means the fraudulent use of the social security number or other method of identifying an "insured". This includes the fraudulent use of the personal identity of an "insured" to establish credit accounts, secure loans, enter into contracts or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

All other provisions of this policy apply.

© 2017, The Hartford Steam Boiler Inspection and Insurance Company.
All rights reserved.

# WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION

## ADDITIONAL INSURED ENDORSEMENT
## Tenant User Liability Insurance Program

| | |
|---|---|
| Named Insured | **Price County** |
| Date this endorsement takes effect | **5/24/2024** |
| Endorsement Number | **6** |
| Policy Number | **15124** |
| Policy Period | **1/1/2024 to 1/1/2025** |

(*We* will not fill in the above unless *we* issue this endorsement after *we* issue *your* policy.)

THIS ENDORSEMENT IS LIMITED TO COVERAGE A ONLY – BODILY INJURY & PROPERTY DAMAGE WITH A LIMIT OF $250,000 EACH OCCURRENCE, SUBJECT TO A DEDUCTIBLE OF $250.

IN CONSIDERATION OF AN ADDITIONAL PREMIUM CHARGED OF $60.00, IT IS HEREBY AGREED THAT THE FOLLOWING IS ADDED TO THE POLICY AS AN ADDITIONAL INSURED ONLY WITH REGARD TO THE NAMED EVENT BEING HELD ON COUNTY OWNED PREMISES:

| | |
|---|---|
| NAME OF TENANT USER: | Country Side Artists |
| ADDRESS: | Attn: Etola Foytek<br>W6223 Big Elk Road<br>Phillips, WI 54555 |
| EVENT: | Arts & Crafts sale |
| LOCATION OF EVENT: | Price County Wisconsin Concrete Park, Phillips, WI |
| DATE OF EVENT | May 24-October 31, 2024 |

5/8/2024
Date

Karen Flynn
Authorized Agent

WISCONSIN county MUTUAL

**WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION**
**Home office at:**
**22 E. Mifflin Street – Suite 900**
**Madison, Wisconsin 53703**

**PUBLIC ENTITY LIABILITY INSURANCE**

**Supplemental Declarations - Public Entity General and Automobile Liability, Uninsured and Underinsured Motorists Insurance and Medical Payments Coverage**

| **FORMS AND ENDORSEMENTS** (other than applicable Forms and Endorsements shown elsewhere in this policy) |
|---|
| Forms and Endorsements applying to this Policy and made part of this policy at time of issue:<br>WCMIC-D300113 (09/2022) Public Entity Liability Insurance Declarations<br>WCMIC-D3002(10/09) Public Entity Liability Insurance Supplemental Declarations<br>WCMIC-300224 (11/2022) Public Entity Liability Insurance Policy<br>WCMIC-END C70223 (11/2023) Cyber Enhancement Endorsement<br>WCMIC-END-03003(10/09) Deductible Liability Insurance Endorsement<br>WCMIC-END M3010 (10/09) General Endorsement Premium Installment<br>WCMIC-END-3024(10/10) Legal Loss Prevention Services<br>Policyholder Disclosure Notice of Terrorism Insurance Coverage<br>WCMIC-END M31011 (10/12) Uninsured Motorist Endorsement<br>GEN-1 (1/91) Personal Injury - Airport<br>WCMIC - END 7721 (4/05) Snowmobile License Agreement<br>WCMIC - END 7715 (4/05) Services Performed<br>WCMIC - END 7713 (4/05) License Agreement<br>WCMIC - END-ID-705A (12/2020) Identity Recovery Coverage<br>**WCMIC - END 7718 (4/05) TULIP** |

Willie Johnson, Jr.
Chairman

Thomas Wegner
Secretary

5/8/2024
Date

Karen Flynn
Authorized Agent